## IN THE UNITED STATES DISTRICT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JENNIFER L. MILLER<br>3030 Fairview Avenue<br>Alameda, CA 94501<br>Derivatively on behalf of FIRSTENERGY<br>CORPORATION<br><br>                                                    Plaintiff,<br><br>        v.<br><br>MICHAEL J. ANDERSON, STEVEN J.<br>DEMETRIOU, JULIA L. JOHNSON,<br>CHARLES E. JONES, DONALD T.<br>MISHEFF, THOMAS N. MITCHELL,<br>JAMES F. O'NEIL III, CHRISTOPHER D.<br>PAPPAS, SANDRA PIANALTO, LUIS A.<br>REYES, LESLIE M. TURNER, STEVEN E.<br>STRAH, ROBERT REFFNER, MICHAEL J.<br>DOWLING, AND EBONY YEBOAH-<br>AMANKWAH,<br>76 S. Main Street, Akron, Ohio 44308<br><br>Defendants,<br><br>        And<br><br>FIRST ENERGY CORPORATION<br>76 S. Main Street, Akron, Ohio 44308<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER<br>DERIVATIVE COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

This Complaint alleges the directors and/or officers of FirstEnergy Corporation ("FirstEnergy" or the "Company") breached their fiduciary duties to the Company, were unjustly enriched, wasted corporate assets, and committed violations of Section 14(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"). Plaintiff Jennifer L. Miller ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant FirstEnergy, alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, among other things, her counsel's investigation, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, criminal complaints and affidavits, and other publicly available documents regarding FirstEnergy. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by FirstEnergy's directors and certain officers and is brought by Plaintiff on behalf of FirstEnergy against Defendants Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Charles E. Jones, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neill III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Leslie M. Turner, Steven E. Strah, Robert Reffner, Michael J. Dowling, Ebony Yeboah-Amankwah (collectively "Defendants") resulting from the breach of fiduciary duties owed by Defendants to FirstEnergy and its shareholders. Plaintiff is, and was at all times relevant hereto, a First Energy shareholder whose interests align with all other shareholders throughout the relevant period.

2.      At all relevant times, Defendants engaged in a concerted effort to curtail losses from nuclear energy operations managed by a subsidiary in order to keep their lofty positions and to increase their own compensation. In furtherance of their scheme, Defendants sanctioned the corporate policy of illegal payments to government officials including the Ohio House Speaker Larry Householder, and other individuals, that resulted in a significant reduction in shareholder value when it was subsequently exposed.

3.      To achieve the foregoing goal while preserving or increasing their own wealth, FirstEnergy's Board of Directors and senior executives engaged in acts, adopted policies and/or failed to act when required to do so, that have resulted in economic harm to Plaintiff and other shareholders.

4.      On July 17, 2020, U.S. officials filed a criminal complaint of conspiracy against Householder and others in the Southern District of Ohio arising out of those illegal payments by FirstEnergy, the revelation of which would cause FirstEnergy's stock to lose up to 45% of its value within hours of the announcement.

5.      In this derivative action, Plaintiff, a shareholder of FirstEnergy stock since 1999, seeks to hold accountable the directors and officers whose actions caused and/or permitted the wrongdoing that the Company has engaged in.

6.      The Defendants' self-dealing, active participation in, and failure to address detailed and credible allegations of criminal activity undertaken with the tacit or express consent of FirstEnergy's CEO and other senior executives is causing, and will continue to cause, the Company substantial harm. Even beyond the reputational damage and loss in market capitalization—FirstEnergy's stock lost 45% percent of its value within hours of the announcement of criminal charges—the total cost to the FirstEnergy and shareholders of its goodwill, diminished value, civil litigation and scorched-earth investigations may well stretch into the billions of dollars.

7.      Through this Action, Plaintiff seeks redress the harm caused by Defendants to FirstEnergy and its shareholders.

8.      In light of the breaches of fiduciary duties engaged in by the Defendants, most of whom are the Company's current directors, their participation in the wrongful conduct complained

of herein , the substantial likelihood of the directors' liability in this derivative action, liability in the securities class action filed against FirstEnergy, Charles E. Jones, James F. Pearson, Steven Strah and K. Jon Taylor in the United States District Court for the Southern District of Ohio, No. 2:20-cv-03785 (July 28, 2020) (the "Securities Class Action"), their being beholden to each other, their longstanding business and personal relationships with each other, and their being neither disinterested nor independent, a majority of First Energy's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company, and thus demand is excused as futile.

## JURISDICTION

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1).

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

13. The Court has personal jurisdiction over each of the Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

14. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a

substantial portion of the transactions and wrongs complained of herein occurred in this District, and FirstEnergy maintains its corporate headquarters in this District.

## PARTIES

15.     Plaintiff, Jennifer L. Miller ("Miller"), is a resident of the State of California who has owned shares of First Energy stock since 1999, and currently owns 812 shares of the Company, was a shareholder at the time of the misconduct complained of herein, and has been a shareholder of First Energy continuously since that time.

16.     Defendant, Michael J. Anderson ("Anderson"), is Chairman of the board of directors of The Andersons, Inc. He has been a Director of First Energy since 2007 and serves on the Board's Audit and Finance Committees. On July 1, 2020, Anderson reported owning 59,181 shares of common stock.

17.      Defendant, Steven J. Demetriou ("Demetriou"), is Chairman, Chief Executive Officer and a director of Jacobs Engineering Group Inc. He has been a Director of First Energy since 2017 and serves on the Finance, Operations, Safety and Nuclear Oversight Committees. On July 1, 2020, Demetriou reported owning 9,651 shares of common stock.

18.     Defendant, Julia L. Johnson ("Johnson"), is President of NetCommunications, LLC. She has been a Director of First Energy since 2011and serves on the Corporate Governance and Corporate Responsibility (Chair) and Finance Committees. On July 1, 2020, Johnson reported owning 10,750 shares of common stock.

19.     Defendant, Charles E. Jones ("Jones"), has been President, CEO, and a director of First Energy since 2015. On March 1, 2020, Jones exercised an option to sell 407,466.991 shares of his FirstEnergy stock for $44.40 per share, yielding proceeds of $18,091,534.40. Jones still owns 699,356 shares and reportedly earns $14,684,700 a year in salary.

20.     Defendant, Donald T. Misheff ("Misheff"), is retired as managing partner of the

Northeast Ohio offices of Ernst & Young LLP. He has been non-executive Chairman of the FirstEnergy Board since May 2018 and Director of FirstEnergy since 2012. He also serves on the Audit; Corporate Governance and Corporate Responsibility Committees. On July 1, 2020, Misheff reported owning 37,157 shares of common stock.

21.     Defendant, Thomas N. Mitchell ("Mitchell"), is Chairman of the World Association of Nuclear Operators. He has been a Director of FirstEnergy since 2016 and serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight (Chair) Committees. On July 1, 2020, Mitchell reported owning 18,985 shares of common stock.

22.     Defendant, James F. O'Neil, III (O'Neill"), is Principal owner of Forefront Solutions, LLC. He has been a Director of FirstEnergy since 2017 and serves on the Compensation (Chair), Operations, and Safety and Nuclear Oversight Committees. On July 1, 2020, O'Neil reported owning 14,129 shares of common stock.

23.     Defendant, Christopher D. Pappas "(Pappas"), is retired as president and chief executive officer of Trinseo. He has been a Director of FirstEnergy since 2011and serves on the Compensation and Finance (Chair) Committees. On July 1, 2020, Pappas reported owning 49,957 shares of common stock.

24.     Defendant, Sandra Pianalto ("Pianalto"), is retired as president and chief executive officer of the Federal Reserve Bank of Cleveland.  She has been a Director of FirstEnergy since 2018 and serves on the Compensation and Audit Committees. On July 1, 2020, Pianalto reported owning 5,538 shares of common stock.

25.     Defendant, Luis A. Reyes ("Reyes"), is retired as a regional administrator of the U.S. Nuclear Regulatory Commission and has been a Director of FirstEnergy since 2013. Reyes

serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight Committees. On July 1, 2020, Reyes reported owning 30,782 shares of common stock.

26.    Defendant, Leslie M. Turner ("Turner"), is retired as senior vice president, general counsel, and corporate secretary of The Hershey Company. She has been a Director of FirstEnergy since 2018 and serves on the Audit and Compensation Committees. On July 1, 2020, Turner reported owning 1,929 shares of common stock.

27.    Defendant, Steve E. Strah ("Strah"), is President of First Energy. He previously served as FirstEnergy's CFO from March 2018 until he transitioned to his current position in May 2020. Prior to March 2018, defendant Strah served as Senior Vice President of FirstEnergy's Utilities Operations. He is a member of FirstEnergy's Leadership Council.

28.    Defendant, Robert Reffner ("Reffner"), is Senior Vice President and Chief Legal Officer, and a member of FirstEnergy's Leadership Council. Reffner is responsible for, among other things, FirstEnergy's Legal, Ethics, Risk and Internal Auditing.

29.    Defendant, Michael Dowling ("Dowling"), is Senior Vice President, External Affairs, and member of FirstEnergy's Leadership Council. Dowling is responsible for FirstEnergy's local, state and federal Governmental Affairs; Energy Policy; State Regulatory Affairs and Market Policies; Economic Development; Corporate Affairs and Community Involvement, and the FirstEnergy Political Action Committee.

30.    Defendant, Ebony Yeboah-Amankwah ("Yeboah-Amankwah"), is Vice President, General Counsel and Chief Ethics Officer, and member of FirstEnergy's Leadership Council.

31.    Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes and Turner are referred to collectively as the "Director Defendants."

Defendants Jones, Strah, Reffner, Dowling and Ebony Yeboah-Amankwah are referred to collectively as the "Officer Defendants."

32.     Like the Director Defendants, all of the Officer Defendants hold significant shares of common stock in the Company and owe the same fiduciary duties to the Company as do the Director Defendants.

33.     Nominal Defendant FirstEnergy is an Ohio corporation headquartered in this District at 76 South Main Street, Akron, Ohio.

## **FACTUAL ALLEGATIONS**

34.     On July 17, 2020, U.S. officials announced the filing of a criminal complaint of conspiracy against Ohio House Speaker Larry Householder ("Householder") and others in the Southern District of Ohio that would cause First Energy's stock to lose up to 45% of its value within hours of the announcement.

35.     The United States alleged that beginning in or about 2016, Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes and a Householder-controlled entity know as Generation Now ("Conspirators" or "Householder Enterprise"), being persons employed by and associated with an enterprise which engaged in activities which affected interstate commerce, did knowingly and intentionally conspire with each other and others known and unknown to violate Title 18 United States Code, Section 1962(c). That is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code § 3517.22(a)(2)); 18 U.S.C. § 1956

(relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under Ohio Revised Code § 2921.02. It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. § 1962(d).

36.     Conspirators constituted an "Enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact. Householder's Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, and the enterprise engaged in, and its activities affected, interstate commerce. According to the United States, there is probable cause to believe that Conspirators conspired to conduct and participate in the conduct of the affairs of Householder's Enterprise through a pattern of racketeering activity from March 2017 to March 2020, Householder's Enterprise received approximately $60 million from First Energy entities, paid through Generation Now and controlled by Householder and the Enterprise. In exchange for payments from FirstEnergy, Householder's Enterprise helped pass House Bill 6 ("HB 6"), legislation described by an Enterprise member as a billion-dollar "bailout" that saved from closure two failing nuclear power plants in Ohio affiliated with FirstEnergy. The Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative. To achieve these ends, and to conceal the scheme, Householder's Enterprise passed money received from FirstEnergy affiliates through multiple entities that it controlled. Householder's Enterprise then used the bribe payments to further the goals of the Enterprise, which include: (1) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments; (2) enriching and benefitting the enterprise,

its members, and associates; and (3) promoting, concealing, and protecting purposes (1) and (2) from public exposure and possible criminal prosecution.

37.     In 2016, FirstEnergy's nuclear generation future looked grim. In its November 2016 Annual Report to Shareholders, Ohio-based FirstEnergy and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate, Company A-1. Given this backdrop, FirstEnergy announced future options for its generation portfolio as follows: "legislative and regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. Bankruptcy laws for its affiliates involved in nuclear generation.

38.     Consistent with this forecast, FirstEnergy actively sought a "legislative solution" for its two, affiliated nuclear power plants in Ohio. For example, during FirstEnergy's fourth-quarter 2016 earnings conference call, FirstEnergy President and CEO Jones stated that:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero-emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.
>
> We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [FirstEnergy] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far, and we will keep you posted as this process unfolds.

39.     However, attempts to obtain a legislative solution had failed to pass, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017.

40.     While FirstEnergy was in search of a solution to its nuclear energy problem,

Householder was re-entering politics, winning back his State House seat in Perry County, Ohio, with the goal of winning back the Speakership in January 2019. Following his January 2017 trip on FirstEnergy's private jet, in March 2017, Householder began receiving quarterly $250,000 payments from FirstEnergy, primarily through its subsidiary FirstEnergy Service Co., into a bank account in the name of a 501(c)(4) entity secretly controlled by Householder called Generation Now. In 2017 and 2018, Householder's Enterprise received into Generation Now, and the entities it controlled, over $2.9 million from FirstEnergy. Members of Householder's Enterprise used FirstEnergy's payments for their own personal benefit and to gain support for Householder's political bid to become Speaker. In the Spring and Fall of 2018, the Enterprise spent millions in FirstEnergy money to support House candidates involved in primary and general elections whom the Enterprise believed both would vote for Householder as Speaker and, ultimately, would follow his lead as Speaker and vote for bailout legislation for FirstEnergy.

41.     The plan worked. Householder-backed candidates that benefitted from FirstEnergy money received by Generation Now ("First Energy-to-Generation-Now" payments) helped elect Householder as the Ohio Speaker of the House in January 2019. Householder fulfilled his end of the corrupt bargain shortly thereafter. Three months into his term as Speaker, HB 6 was introduced to save from closure FirstEnergy-1's two failing nuclear power plants. Specifically, HB 6 subsidized nuclear energy operations in Ohio through a monthly charge on all Ohioan's energy bills. Neil Clark described the legislation as a "bailout" for FirstEnergy's nuclear assets, worth $1.3 billion to FirstEnergy.

42.     After the introduction of the bailout legislation, FirstEnergy began increasing its payments into Generation Now for the benefit of the Enterprise. On April 30, 2019, roughly two weeks after introduction of the legislation, FirstEnergy wired $1.5 million to Generation Now. In the month of May 2019, while the controversial legislation was pending before lawmakers,

FirstEnergy wired four additional payments totaling $8 million. The Enterprise used some of that money for mailers and media advertisements to pressure members to support the legislation; the Enterprise also used FirstEnergy money for their personal benefit, as described below. In the same month that the Enterprise received $8 million from FirstEnergy, Householder and other Enterprise members pressured House members to vote for HB 6, and instructed at least one representative to destroy text messages from Householder after Householder attempted to gain support for HB 6 from the representative.

43.    On May 29, 2019, HB 6 passed the House, and after Enterprise members exerted pressure on the Senate, the legislation was passed and was signed into law by the Governor. That process took about two months. However, the law would not go into effect until October 22, 2019. Shortly after the Governor signed the legislation, a campaign began to organize a state-wide ballot initiative referendum ("Ballot Campaign") to overturn the legislation. This required Ballot Campaign organizers to collect the signatures of registered voters in order to put the referendum of HB 6 on the 2020 ballot. And so, FirstEnergy's and the Enterprise's fight continued.

44.    In response, from July 24 to October 22, 2019, FirstEnergy-controlled accounts wired over $38 million into Generation Now to defeat the ballot initiative so HB 6 would go into effect.  The Enterprise funneled the money to various accounts and entities controlled by the Enterprise to purchase media ads and mailers against the ballot initiative, to conflict out signature collection firms, and to pay off and bribe signature collectors supporting the referendum. The members and associates of the Enterprise also used the FirstEnergy money to enrich themselves and further their personal interests.

45.    FirstEnergy entities paid Householder's Enterprise $60,886,835.86 in secret payments over the approximately three-year period in exchange for the billion-dollar-bailout. The

Enterprise concealed the payments by using a 501(c)(4) to receive the bribe money, and then transferring the payments internally to a web of related entities and accounts. Throughout this time, Defendant Jones, FirstEnergy's CEO, conducted over 80 telephone conferences with Householder. The millions paid into the entity are akin to bags of cash--unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny--and the Enterprise freely spent the bribe payments to further the Enterprise's political interests and to enrich themselves. As Conspirator Neil Clark stated in a 2019 recorded conversation, FirstEnergy operated as the Enterprise's "Bank." Clark explained, "*Generation Now is the Speaker' s (c)(4),*" and FirstEnergy's "*deep pockets,*" and the money to the Enterprise through Generation Now was "*unlimited.*" Conspirator Matthew Borges similarly described FirstEnergy's payments to the Enterprise as "*Monopoly money.*"

46.     The Enterprise used some of the FirstEnergy money to help enact the bailout legislation. Additionally, the Enterprise used millions of dollars of FirstEnergy bribe money to further Householder's political ambitions by funding his own campaign, and the campaigns of members and candidates who would eventually support Householder's election for Speaker. The FirstEnergy payments funded the operating costs of the Enterprise and paid for Householder's political and campaign staff. Conspirators also paid themselves personally millions of dollars.

47.     Although Householder's name is not on Generation Now's paperwork, Householder's statements, Clark's statements and a review of documentation obtained pursuant to search warrants and grand jury subpoenas show that Householder controls Generation Now to further the Enterprise's goals.

48.     The Householder Enterprise benefitted from FirstEnergy's money by spending FirstEnergy-to-Generation Now funds to back Householder-selected candidates who would help

elect Householder as Speaker. The Enterprise also used the money to pay for part of Householder's own campaign.

49.     By the end of 2016, the Enterprise implemented a strategy for Householder to take over the Speakership in 2019. The Enterprise's strategy included raising money through a "C4" and recruiting candidates who, if elected, would support Householder for Speaker. To implement the two-fold strategy of recruitment and fundraising, the Enterprise needed to recruit a team of electable candidates who would support Householder's bid for speakership.

50.     The Enterprise selected a group of candidates to run for open seats in the primary against supporters of Householder's rival, who was backed by the then-current Speaker. The Enterprise managed the selected candidates' campaigns, paid to staff them, and designed and paid for their mailers and commercials. Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker; and all but two, voted for the legislative bailout for First Energy.

51.     Having secured Householder's power as Speaker, the Enterprise transitioned quickly to fulfilling its end of the corrupt bargain with FirstEnergy: passing nuclear bailout legislation. On January 7, 2019, the day he was elected Speaker, Householder pledged to create a standing subcommittee on energy generation. Householder then followed through shortly after his election as Speaker by passing the HB 6 legislation and defending the bill against the ballot initiative challenge. The Enterprise's efforts to pass the legislation and preserve it against the Ballot Campaign challenge were funded entirely by FirstEnergy through payments to Generation Now.

52.     Consistent with their agreement, the Enterprise implemented a strategy to pass a legislative fix for FirstEnergy shortly after Householder was selected Speaker. The strategy

involved ramming a sweeping piece of legislation – HB 6 – through the House and pushing the Senate to agree. On April 12, 2019, roughly three months after Householder became Speaker, HB 6 was introduced. Although titled "Ohio Clean Air Program," HB 6 essentially was created to prevent the shutdown of FirstEnergy's nuclear plants.

53.    Immediately after passage of HB 6, a "Ballot Campaign" mobilized to repeal HB 6 through a ballot referendum. Under Ohio law, in order to place a referendum on the ballot, a group must collect 1,000 certified signatures and submit proposed ballot language to the Ohio Attorney General for approval. The approval ensures that the description of the referendum meets the "fair and truthful" standard outlined in the Ohio Revised Code.

54.    HB 6 was important to the Householder's Enterprise because it received millions of dollars into Generation Now from FirstEnergy in exchange for enactment of the bailout legislation. Thus, the repeal of HB 6, which would prevent HB 6 from taking effect in October 2019, was viewed as a threat to Householder's Enterprise. In the wake of negative press and pressure from House leadership relating to Generation Now media buys supporting HB 6, the Enterprise used "Front Company," which was controlled by the Enterprise, to conceal their efforts to combat the referendum. Ultimately, the Enterprise pumped $23,000,000 of FirstEnergy-to-Generation- Now money into Front Company and used the organization to fund criminal acts to defeat the referendum. The Enterprise's efforts were a success: on October 21, 2019, the Ballot Campaign failed to collect enough signatures, and HB 6 went into effect.

## THE FIDUCIARY DUTIES OF THE DEFENDANTS

55.    By reason of their positions as officers, directors, and/or fiduciaries of FirstEnergy and because of their ability to control the business and corporate affairs of FirstEnergy, the Defendants each owed First Energy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and

manage FirstEnergy in a fair, just, honest, and equitable manner. The Defendants were and are required to act in furtherance of the best interests of FirstEnergy and its shareholders so as to benefit all shareholders equally.

56.    Each director and officer of the Company owes to FirstEnergy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57.    The Defendants, because of their positions of control and authority as directors and/or officers of FirstEnergy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

58.    To discharge their duties, the officers and directors of FirstEnergy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

59.    Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of FirstEnergy, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers and directors of the Company has been ratified by the Director Defendants who collectively comprised FirstEnergy's Board at all relevant times.

60.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the New

York Stock Exchange, the Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

61.     To discharge their duties, the officers and directors of FirstEnergy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of FirstEnergy were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Ohio and the United States, and pursuant to FirstEnergy's own Code of Business Conduct(the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how FirstEnergy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of FirstEnergy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that FirstEnergy's operations would comply with all applicable laws and FirstEnergy's financial statements and regulatory filings filed with the SEC and

disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

62. Each of the Defendants further owed to FirstEnergy and the shareholders the duty of loyalty requiring that each Defendant favor FirstEnergy's interest and that of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

63. At all times relevant hereto, the Defendants were the agents of each other and of FirstEnergy and were at all times acting within the course and scope of such agency.

64. Because of their advisory, executive, managerial, and directorial positions with FirstEnergy, each of the Defendants had access to adverse, non-public information about the Company.

65. The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by FirstEnergy.

66. Defendants owe fiduciary duties to FirstEnergy and its shareholders, including duties of loyalty, good faith, and candor. In addition, FirstEnergy's foundational corporate documents detail the requirements of the Board's duties, requiring, *inter alia*, that the Board actively identify and report any illegal and/or unethical business practices within the Company.

67.     FirstEnergy's Code of Business Conduct provides, in part, as follows:

This Code of Business Conduct (the "Code") serves as a reminder of the high standards we must meet in our day-to-day business activities. It also helps to guide us when formulating and pursuing Company goals and objectives.

FirstEnergy personnel are all responsible for complying with applicable laws and regulations and the principles and provisions included in this Code.

No single book or code of conduct policy can provide answers to every situation.  This Code is to be used as a guide for ethical conduct and help foster a culture of honesty and accountability.  It is endorsed by FirstEnergy's Board of Directors and executives, communicates our culture of intolerance for retaliation, provides policy guidance, and concludes with a question and answer section.

It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity and engage in open, honest, direct, and ongoing dialogue. In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and personnel to fully comply with all applicable laws, regulations, and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct.

*"Maintaining high ethical standards builds trust with customers, shareholders, FirstEnergy Personnel, and the communities we serve.  At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job."*

***Fair Dealing*** - We have built a reputation as a trustworthy and ethical member of our community and our industry.  We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform, or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers.  You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, Code of Business Conduct 6 honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices.  Also, please

19

be aware that special rules apply when dealing with government employees. You should direct any questions about dealing with government employees to your supervisor."

***Conflicts of Interest*** - We should all be aware of any potential influences that impact or appear to impact our loyalty to FirstEnergy.  A "conflict of interest" can occur when your personal interest interferes with – or may appear to interfere with – the interests of the Company as a whole, or when your personal interests make it difficult for you to perform your job duties objectively and effectively.  Conflicts of interest also arise when personnel, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company.   Avoid situations in which your personal interests are in conflict, or appear to be in conflict, with the interests of the Company or your job responsibilities.  This includes the use of knowledge gained through your work activities to make decisions that will lead to personal gain and that are contrary to the law or the interests of the Company.  This also includes financial relationships, including equity interests and loans to, or guarantees of obligations of, the party with the FirstEnergy relationship.  Furthermore, the Company will not make any loans or guarantees to executive officers or their family members.  You also have the specific responsibility of understanding and abiding by the Company's expanded Conflicts of Interest Policy.

68.    FirstEnergy's Conflict-Of-Interest Policy also states, among other things, that:

All personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer, have an obligation to conduct Company-related business in an environment free from the influence of conflicting personal interests. Generally, a conflict of interest arises when our position or job responsibilities present an opportunity for personal gain or when an obligation or situation resulting from our personal activities and financial affairs may influence our judgment and action in the performance of our Company duties.

## **DERIVATIVE ALLEGATIONS**

69.    Plaintiff brings this action derivatively to redress injuries suffered by FirstEnergy as a result of the breaches of fiduciary duties by Defendants.

70.    Plaintiff owned FirstEnergy stock during the time of the wrongful course of conduct constituting the basis for the claims asserted herein and continues to hold such stock.

71.    Plaintiff's stock value was significantly reduced and negatively impacted as a result

of the action and/or inactions as alleged herein.

72.     Plaintiff's claims and economic position is not antagonistic to the other shareholders, whose stock value(s) were also significantly and negatively impacted by Defendants' actions and/or inactions as alleged herein.

73.     Plaintiff will adequately and fairly represent the interests of FirstEnergy and its shareholders in prosecuting and enforcing its rights and has retained counsel competent and experienced to prosecute this action.

## DEMAND ON THE FIRST ENERGY BOARD IS EXCUSED AS FUTILE

74.     A pre-suit demand on the Board of FirstEnergy is futile and, therefore, excused.

75.     At the time of the filing of this action, the FirstEnergy Board was comprised of eleven directors. Plaintiff needs only to allege demand futility as to six of these eleven directors.

76.     Demand is excused as to all of the Director Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of their violations of law alleged herein.

77.     Demand is likewise excused because a majority – seven members – of the current Board served on the Company's Board as of March 2017. Those seven members, Defendants Anderson, Johnson, Jones, Misheff, Mitchell, Pappas, and Reyes recommended that shareholders vote ***against a shareholder proposal requesting transparency and accountability on lobbying policies and payments*** that would have required disclosure of the wrongdoing at issue. Similar shareholder proposals were defeated in 2015 and 2016, with Defendants Anderson, Johnson, Jones, Misheff, Pappas, and Reyes recommending shareholders vote ***against*** the proposals in each of those years.

78.     More specifically, on March 31, 2017, the Company filed its Schedule 14A with

the SEC (the "2017 Proxy Statement"). Included in the 2017 Proxy Statement was a shareholder

proposal requiring an annual report on lobbying policies and payments. According to the 2017

Proxy Statement, FirstEnergy shareholder, The Nathan Cummings Foundation, planned to

introduce the proposal at the Company's Annual Meeting as follows:

> **Whereas:** we believe full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders.

> **Resolved,** the shareholders of FirstEnergy request the preparation of a report, updated annually, disclosing:

> 1.  Company policies and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.

> 2.  Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.

> 3.    FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.

> 4.    A description of the decision making process and oversight by management and the Board for making payments described in section 2 and 3 above.

> For purposes of this proposal, a "grassroots lobbying communication" is a communication is a communication directed to the general public that (a) refers to specific legislation or regulation, (b) reflects a view on the legislation or regulation and (c) encourages the recipient of the communication to take action with respect to the legislation or regulation. "Indirect lobbying" is lobbying engaged in by a trade association or other organization of which FirstEnergy is a member.

> Both "direct and indirect lobbying" and "grassroots lobbying communications" includes efforts at the local, state and federal levels.

> The report shall be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

> As shareholders, we encourage transparency and accountability in FirstEnergy's use of corporate funds to influence legislation and regulation,

both directly and indirectly. FirstEnergy spent approximately $4.05 million in 2014 and 2015 on direct federal lobbying activities (opensecrets.org). These figures do not include lobbying expenditures to influence legislation in states, where FirstEnergy also lobbies but disclosure is uneven or absent. For example, FirstEnergy spent $1.07 million on lobbying in New Jersey for 2014 and 2015, and FirstEnergy's lobbying on energy rates in West Virginia has drawn media attention ("FirstEnergy Asking for Surcharge to Fund Improvements," *Charleston Gazette-Mail,* August 25, 2016).

FirstEnergy is listed as a member of the of the Edison Electric Institute and Nuclear Energy Institute, which together spent $21.32 million lobbying in 2014 and 2015. However, FirstEnergy does not disclose its membership in, or payments to, trade associations, or the amounts used for lobbying, despite a 2007 agreement with shareholders to annually disclose trade association payments used for political purposes ("More Firms to Make Political Disclosures," *CFO,* April 4, 2007). Nor does FirstEnergy disclose membership in or contributions to tax exempt organizations that write and endorse model legislation, such as the American Legislative Exchange Council.

We are concerned that FirstEnergy's current lack of trade association disclosure presents reputational risk. Absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests.

79.     FirstEnergy's 2017 Board responded to the shareholder proposal as follows:

Your company believes that it has a responsibility to participate in the legislative, regulatory and political process. Sharing its views and educating officeholders, regulators, community and business leaders, and the public on key issues helps your Company promote effective government and the interests of key stakeholder groups including our shareholders, employees and communities we serve. By engaging with elected officials, regulators, community and business leaders, and other decision makers, your Company strives to conduct its business as transparently as possible to serve customers effectively and help build public trust.

In addition to the existing extensive framework of laws and public disclosure, your Company adopted a Political Activity Policy, which was most recently updated in October 2016. The Political Activity Policy addresses your Company's participation in the political process and political contributions and lobbying expenses.

Such policy can be found at https://www.FirstEnergycorp.com/investor/corporate_governance/policies_charters/corporate_political_activity_policy.html.

The Political Activity Policy also provides links to access your Company's federal lobbing reports. Your Company complies with all federal and state lobbying registration and disclosure requirements, which include filing all required reports with the U.S. Congress and applicable state agencies.

These reports detail information such as the particular bills and issues on which individual lobbyists had activity on behalf of your Company, as well as the lobbying expenses for specific time periods. As set forth in the Political Activity Policy, your Company maintains and files Lobbying Disclosure Act Reports (Form LD-2) with the U.S. Congress. These reports detail the particular bills and issues on which individual lobbyists had activity on behalf of your Company, as well as the total lobbying expenses, including payments made to trade organizations. These reports may be found at: http://www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm.

Additionally, as described in the Political Activity Policy, your Company and its registered federal lobbyists must also file semi-annual reports detailing, among other things, disbursements and personal and/or direct contributions to federal candidates national party committees. These forms (LD-203) may be found at: http://www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm.

State reports disclosing activity at the state and local levels, if required, are also made publicly available for review on the applicable state agency website.

Your Company is committed to providing appropriate information and disclosures to its investors concerning its lobbying activities. Additionally, your Company believes that its current procedures and policies promote transparency and compliance with the law and addresses the concerns identified in the proposal. Preparation of reports beyond what is already produced would be a duplicative and onerous task that would divert important resources from alternative efforts that your Company's Board and management deem to be in the best interests of your Company and its shareholders. Substantially similar shareholder proposals did not receive a majority of the votes cast in 2015 and 2016.

Your Board recommends that you
**Vote "AGAINST" this shareholder proposal (Item 9).**

80.     Thus, the Company's Board has demonstrated long-standing opposition to transparency regarding payments to public officials at the state level, as its recommendation to vote against shareholder proposals requiring such disclosure in 2015, 2016 and 2017 demonstrate.

Moreover, in 2017, just months after the illegal scheme started, a majority of the current Board recommended shareholders vote *against* the proposal that would have required disclosure of the illegal payments at issue, demonstrating that demand on the current Board to take action in response to the illegal payments would be futile.

81.     Demand is further excused as futile because each of the Director Defendants has received and continues to receive compensation for his or her role as Director. As trusted Directors, they conducted little, if any, oversight of the contributions at issue, and consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For those reasons, too, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and therefore, excused.

82.     In addition, the sheer size of these contributions totaling in excess of $60 million could not be done without the Director Defendants' knowledge and approval. All of the Director Defendants were required to participate in both the review and approval of First Energy's activities including, without limitation, payment of approximately $61,000,000.00 designed to assist Householder's Enterprise, which resulted in a legislative kickback through the passage of House Bill 6 of approximately $1,5 Billion dollars. Indeed, Defendant Jones has publicly stated that First Energy is innocent and "acted ethically" in connection with efforts to pass House Bill 6 that federal prosecutors say were fueled by bribery, which statement acknowledges that Defendants were aware of the decision to funnel bribes to Householder's Enterprise, and approved them.

83.     All Director Defendants are directors, and their self-dealing as alleged herein resulted in direct financial gains to Defendants from the challenged transactions and actions as alleged herein, making it a substantial likelihood that each of the Director Defendants named herein

will be found liable for their self-dealing actions, participation, approval and/or ratification of FirstEnergy's participation in Householder's Enterprise.

84.     In light of the foregoing actions, a majority of the Director Defendants lost their independence and/or lack the ability to bring a disinterested business judgment to bear if demand had been made relative to the Householder Enterprise.

85.     FirstEnergy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FirstEnergy any part of the damages FirstEnergy suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

86.     For all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least seven of them (a majority), cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is exercised as futile.

### CLAIMS FOR RELIEF

### COUNT I
**Against the Director Defendants for Violations of
Section 14(a) of the Exchange Act**

101.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

102.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

103.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

104.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

105.    Under the direction and watch of the Director Defendants, the Company's 2017, 2018 and 2019 Proxy Statements filed with the SEC on March 31, 2017, March 30, 2018 and April 1, 2019 (the "Proxy Statements") failed to disclose, *inter alia,* the illegal scheme described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the Proxy Statements false and misleading.

106.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, ratification of the Company's independent auditor, and whether or

not to approve the shareholder proposal requiring an annual report on lobbying policies and payments.

107.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

108.    Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duty Against All Defendants

109.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

110.    Each Defendant owed to the Company the duty to exercise candor, good faith, due care, and loyalty in the management and administration of FirstEnergy's business and affairs.

111.    Each of the Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, due care, reasonable inquiry, oversight and supervision.

112.    By virtue of their positions as directors and/or officers of FirstEnergy and their exercise of control over the business and corporate affairs of the Company, the Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein. Each Defendant was required to: (a) use his or her ability to control and manage FirstEnergy in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of FirstEnergy and its shareholders and not his or her own. Defendants also have the duty to oversee its CEO and ensure that he is not breaching his fiduciary duties to the Company.

113.    Additionally, Defendants have a duty to implement a reasonable system of controls to ensure that FirstEnergy is operated in conformity with applicable laws. Once that

system is in place, the Directors have a duty to respond in good faith to reports or indications that FirstEnergy or its employees are engaging in unlawful or other improper behavior. Defendants have acted in violation of FirstEnergy's internal policies, including, *inter alia*, its policies regarding corporate governance, anti-corruption, and ethics.

114.    The Company's corporate governance guidelines also require Defendants to review compliance with applicable laws and regulations and adopt policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls.

115.    Defendants breached their fiduciary duties through self-dealing and/or by acting to subvert and/or failing to take any action to investigate and/or stop the improper and illegal conduct at FirstEnergy involving bribery.

116.    Based on the foregoing conduct, Defendants were not acting in good faith toward the Company, but instead were acting recklessly and/or with intent to harm the Company and breached their fiduciary duties.

117.    As a direct and proximate result of Defendants' conscious failure to perform their fiduciary obligations, FirstEnergy has been and will continue to be damaged.

118.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

119.    Plaintiff, on behalf of First Energy, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all defendants as follows:

A.    Declaring that Defendants have breached their fiduciary duties to FirstEnergy;

B.    Declaring that Plaintiff may maintain this action on behalf of FirstEnergy and that Plaintiff is an adequate representative of the

Company;

C.      Appointing Plaintiff's counsel as Lead Counsel for this derivative action;

D.      Determining that this action is a proper derivative action maintainable under law;

E.      Determining that Rule 23.1's pre-suit demand requirement for standing is excused as futile under the circumstances;

F.      Determining and awarding to FirstEnergy the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

G.      Directing FirstEnergy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

H.      Awarding FirstEnergy damages including, without limitation, punitive damages, together with pre-and post-judgment interest to the Company in excess of $25,000 as to all Counts;

I.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.      Granting such other and further relief as this Court deems just and equitable.

Plaintiff hereby demand a trial by jury.

Dated: August 7, 2020

/s/ Alan L. Rosca
Alan L. Rosca (OBN 0084100)
Goldman Scarlato & Penny, PC
23250 Chagrin Blvd., Suite 100
Beachwood, OH 44122
T 484-342-0700
rosca@lawgsp.com

Marc H. Edelson, Esq.
(*pro hac vice to be submitted*)
Eric Lechtzin, Esq.
(*pro hac vice to be submitted*)
Edelson Lechtzin LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
T 215-867-2399
F 267 685-0676
medelson@edelson-law.com
elechtzin@edelson-law.com


Paul J. Scarlato (PA 47055)
(*pro hac vice to be submitted*)
Goldman Scarlato & Penny, PC
161 Washington Street, Suite 1025
Conshohocken, PA 19428
T 484-342-0700
scarlato@lawgsp.com

## VERIFICATION

I, Jennifer L. Miller, hereby state that I am the Plaintiff in the foregoing action; that I am familiar with and have personal knowledge of the facts referred to in the foregoing Derivative Complaint and that to the best of my knowledge, information and belief they are true and complete.

I understand that the statements in this Verification are made subject to the penalties of perjury, 28 U.S.C. § 1746, executed under the penalty relating to unsworn declarations.

DocuSigned by:

*Jennifer L. Miller*

8B3F8F8AFF0540A...

8/5/2020