## IN THE UNITED STATES DISTRICT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JENNIFER L. MILLER Derivatively on behalf of FIRSTENERGY CORPORATION<br><br>                              Plaintiff,<br><br>       v.<br><br>MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, JULIA L. JOHNSON, CHARLES E. JONES, DONALD T. MISHEFF, THOMAS N. MITCHELL, JAMES F. O'NEIL III, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, LUIS A. REYES, LESLIE M. TURNER, STEVEN E. STRAH, ROBERT REFFNER, MICHAEL J. DOWLING, AND EBONY YEBOAH-AMANKWAH,<br><br>                              Defendants,<br><br>       And<br><br>FIRST ENERGY CORPORATION<br>                    Nominal Defendant. | Case No.<br><br><br>**AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

This Amended Complaint alleges the directors and/or officers of FirstEnergy Corporation ("FirstEnergy" or the "Company") breached their fiduciary duties to the Company, were unjustly enriched, wasted corporate assets, and committed violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff Jennifer L. Miller ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant FirstEnergy, alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, among other things, her counsel's investigation, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, criminal complaints and affidavits, and other publicly available

documents regarding FirstEnergy. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by FirstEnergy's directors and certain officers and is brought by Plaintiff on behalf of FirstEnergy against Defendants Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Charles E. Jones, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neill III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Leslie M. Turner, Steven E. Strah, Robert Reffner, Michael J. Dowling, Ebony Yeboah-Amankwah (collectively "Defendants") resulting from the breach of fiduciary duties owed by Defendants to FirstEnergy and its shareholders. Plaintiff is, and was at all times relevant hereto, a First Energy shareholder whose interests align with all other shareholders throughout the relevant period.

2.     At all relevant times, Defendants engaged in a concerted effort to curtail losses from nuclear energy operations managed by a subsidiary in order to keep their lofty positions and to increase their own compensation. In furtherance of their scheme, Defendants sanctioned the corporate policy of illegal payments to government officials including the Ohio House Speaker Larry Householder, and other individuals, that resulted in a significant reduction in shareholder value when it was subsequently exposed.

3.     To achieve the foregoing goal while preserving or increasing their own wealth, FirstEnergy's Board of Directors and senior executives engaged in acts, adopted policies and/or failed to act when required to do so, that have resulted in economic harm to Plaintiff and other shareholders.

4.     In this derivative action, Plaintiff, a shareholder of FirstEnergy stock since 1999,

seeks to hold accountable the directors and officers whose actions caused and/or permitted the wrongdoing in which the Company has engaged.

5. The Defendants' self-dealing, active participation in, and failure to address detailed and credible allegations of criminal activity undertaken with the tacit or express consent of FirstEnergy's CEO and other senior executives is causing, and will continue to cause, the Company substantial harm. Even beyond the reputational damage and loss in market capitalization—FirstEnergy's stock lost 45% percent of its value within hours of the announcement of criminal charges—the total cost to the FirstEnergy and shareholders of its goodwill, diminished value, civil litigation and scorched-earth investigations may well stretch into the billions of dollars.

6. Through this Action, Plaintiff seeks redress the harm caused by Defendants to FirstEnergy and its shareholders.

7. In light of the breaches of fiduciary duties engaged in by the Defendants, most of whom are the Company's current directors, their participation in the wrongful conduct complained of herein, the substantial likelihood of the directors' liability in this derivative action, liability in the securities class actions filed against FirstEnergy, Charles E. Jones, James F. Pearson, Steven Strah and K. Jon Taylor in the United States District Court for the Southern District of Ohio, (the "Securities Class Actions"), their potential liability in other actions arising out of these events, including a recent action by the Ohio Attorney General, their being beholden to each other, their longstanding business and personal relationships with each other, and their being neither disinterested nor independent, a majority of First Energy's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company, and thus demand is excused as futile.

## JURISDICTION

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1).

9.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     The Court has personal jurisdiction over each of the Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and FirstEnergy maintains its corporate headquarters in this District.

## PARTIES

14.     Plaintiff, Jennifer L. Miller ("Miller"), is a resident of the State of California who has owned shares of First Energy stock since 1999, and currently owns 812 shares of the Company, was a shareholder at the time of the misconduct complained of herein, and has been a shareholder of First Energy continuously since that time.

15.     Defendant, Michael J. Anderson ("Anderson"), is Chairman of the board of

directors of The Andersons, Inc. He has been a Director of First Energy since 2007 and serves on the Board's Audit and Finance Committees. From 2016 to 2019, Anderson was awarded $1,031,757 in fees, stock awards and other compensation for his service on the Board. On July 1, 2020, Anderson reported owning 59,181 shares of common stock.

16.     Defendant, Steven J. Demetriou ("Demetriou"), is Chairman, Chief Executive Officer and a director of Jacobs Engineering Group Inc. He has been a Director of First Energy since 2017 and serves on the Finance, Operations, Safety and Nuclear Oversight Committees. From 2017 to 2019, Demetriou was awarded $704,538 in fees, stock awards and other compensation for his service on the Board. On July 1, 2020, Demetriou reported owning 9,651 shares of common stock.

17.     Defendant, Julia L. Johnson ("Johnson"), is President of NetCommunications, LLC. She has been a Director of First Energy since 2011and serves on the Corporate Governance and Corporate Responsibility (Chair) and Finance Committees. From 2016 to 2019, Johnson was awarded $953,825 in fees, stock awards and other compensation for her service on the Board. On July 1, 2020, Johnson reported owning 10,750 shares of common stock.

18.     Defendant, Charles E. Jones ("Jones"), has been President, CEO, and a director of First Energy since 2015. In 2016 Jones was paid $14,117,750 in total compensation with a base salary of $1,133,840; in 2017 Jones was paid $15,281,885 in total compensation with a base salary of $1,136,113; in 2018 Jones was paid $11,123,128 in total compensation with a base salary of $1,136,113; and in 2019 Jones was paid $14,684,659 in total compensation with a case salary of $1,136,113. On March 1, 2020, Jones exercised an option to sell 407,466.991 shares of his FirstEnergy stock for $44.40 per share, yielding proceeds of $18,091,534.40. Jones still owns 699,356 shares.

19.     Defendant, Donald T. Misheff ("Misheff"), is retired as managing partner of the Northeast Ohio offices of Ernst & Young LLP. He has been non-executive Chairman of the FirstEnergy Board since May 2018 and Director of FirstEnergy since 2012. He also serves on the Audit, Corporate Governance, and Corporate Responsibility Committees. From 2016 to 2019, Misheff was awarded $1,224,230 in fees, stock awards and other compensation for his service on the Board. On July 1, 2020, Misheff reported owning 37,157 shares of common stock.

20.     Defendant, Thomas N. Mitchell ("Mitchell"), is Chairman of the World Association of Nuclear Operators. He has been a Director of FirstEnergy since 2016 and serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight (Chair) Committees. From 2016 to 2019, Mitchell was awarded $978,193 in fees, stock awards and other compensation for his service on the Board. On July 1, 2020, Mitchell reported owning 18,985 shares of common stock.

21.     Defendant, James F. O'Neil, III (O'Neill"), is Principal owner of Forefront Solutions, LLC. He has been a Director of FirstEnergy since 2017 and serves on the Compensation (Chair), Operations, and Safety and Nuclear Oversight Committees. From 2017 to 2019, O'Neil was awarded $739,825 in fees, stock awards and other compensation for his service on the Board. On July 1, 2020, O'Neil reported owning 14,129 shares of common stock.

22.     Defendant, Christopher D. Pappas "(Pappas"), is retired as president and chief executive officer of Trinseo. He has been a Director of FirstEnergy since 2011, and serves on the Compensation and Finance (Chair) Committees. From 2016 to 2019, Pappas was awarded $1,009,482 in fees, stock awards and other compensation for his service on the Board. On July 1, 2020, Pappas reported owning 49,957 shares of common stock.

23.     Defendant, Sandra Pianalto ("Pianalto"), is retired as president and chief executive

officer of the Federal Reserve Bank of Cleveland. She has been a Director of FirstEnergy since 2018 and serves on the Compensation and Audit Committees. From 2018 to 2019, Pianalto was awarded $452,838 in fees, stock awards and other compensation for her service on the Board. On July 1, 2020, Pianalto reported owning 5,538 shares of common stock.

24. Defendant, Luis A. Reyes ("Reyes"), is retired as a regional administrator of the U.S. Nuclear Regulatory Commission and has been a Director of FirstEnergy since 2013. Reyes serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight Committees. From 2016 to 2019, Reyes was awarded $948,601 in fees, stock awards and other compensation for his service on the Board. On July 1, 2020, Reyes reported owning 30,782 shares of common stock.

25. Defendant, Leslie M. Turner ("Turner"), is retired as senior vice president, general counsel, and corporate secretary of The Hershey Company. She has been a Director of FirstEnergy since 2018 and serves on the Audit and Compensation Committees. From 2018 to 2019, Anderson was awarded $314,836 in fees, stock awards and other compensation for her service on the Board. On July 1, 2020, Turner reported owning 1,929 shares of common stock.

26. Defendant, Steve E. Strah ("Strah"), is President of First Energy. He previously served as FirstEnergy's CFO from March 2018 until he transitioned to his current position in May 2020. Prior to March 2018, defendant Strah served as Senior Vice President of FirstEnergy's Utilities Operations. He is a member of FirstEnergy's Leadership Council.

27. Defendant, Robert Reffner ("Reffner"), is Senior Vice President and Chief Legal Officer, and a member of FirstEnergy's Leadership Council. Reffner is responsible for, among other things, FirstEnergy's Legal, Ethics, Risk and Internal Auditing.

28. Defendant, Michael Dowling ("Dowling"), is Senior Vice President, External

Affairs, and member of FirstEnergy's Leadership Council. Dowling is responsible for FirstEnergy's local, state and federal Governmental Affairs; Energy Policy; State Regulatory Affairs and Market Policies; Economic Development; Corporate Affairs and Community Involvement, and the FirstEnergy Political Action Committee.

29.     Defendant, Ebony Yeboah-Amankwah ("Yeboah-Amankwah"), is Vice President, General Counsel and Chief Ethics Officer, and member of FirstEnergy's Leadership Council.

30.     Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes and Turner are referred to collectively as the "Director Defendants." Defendants Jones, Strah, Reffner, Dowling and Ebony Yeboah-Amankwah are referred to collectively as the "Officer Defendants."

31.     Like the Director Defendants, all of the Officer Defendants hold significant shares of common stock in the Company and owe the same fiduciary duties to the Company as do the Director Defendants.

32.     Nominal Defendant FirstEnergy is an Ohio corporation headquartered in this District at 76 South Main Street, Akron, Ohio.

## **FACTUAL ALLEGATIONS**

33.     On July 21, 2020, the United States Attorney for the Southern District of Ohio announced the filing of a criminal complaint of conspiracy against Ohio House Speaker Larry Householder ("Householder"), two of FirstEnergy's lobbyists, and multiple members of Householder's staff Southern District of Ohio. The complaint alleged that the defendants participated in a racketeering scheme involving the payment of ***over $60 million*** by FirstEnergy to an entity controlled by Householder, called Generation Now, in order to secure Householder's assistance in passing and upholding House Bill 6 ("HB6") introduced in the Ohio state legislature

in early 2019, and passed in July 2019. HB 6 provided a massive $1.3 bailout for FirstEnergy's failing nuclear power plants as well as other one-sided legislative amendments, including provisions that removed incentives to build renewable energy projects, cancelled statewide energy conservation efforts, and allowed FirstEnergy to upcharge customers for their energy.

34.     In announcing the filing of the complaint, the U.S. Attorney called the underlying scheme the "largest bribery, money-laundering scheme ever perpetrated" in Ohio.[1] The criminal complaint states that FirstEnergy, identified only as "Company A," but which owned the nuclear plants involved, paid Householder's enterprise **over $60 million** in secret payments over a three-year period in exchange for the billion-dollar-plus bailout provided by HB 6.

35.     Despite FirstEnergy's claims that HB 6's bailout would not benefit the corporation, according to an affidavit submitted by the FBI in the criminal case, nearly all of the money used to fund the bribery scheme came from FirstEnergy.[2]

36.     The announcement of the criminal charges and bribery scheme caused First Energy's stock to lose up to 45% of its value within hours.

37.     The criminal complaint alleged that beginning in or about 2016, Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes and Householder-controlled Generation Now ("Conspirators" or "Householder Enterprise"), being persons employed by and associated with an enterprise which engaged in activities which affected interstate commerce, did knowingly and intentionally conspire with each other and others known and unknown to violate Title 18 United States Code, Section 1962(c). That is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity,

---

[1]  https://www.cincinnati.com/story/news/2020/07/21/ohio-bribery-case-state-official-charged-federal-prosecutors/5477862002/
[2]  https://apnews.com/article/ohio-laws-legislation-archive-utilities-4f5578e4644ad8ec74d4738bad755687

as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code ("R.C.") § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under R.C. § 2921.02. It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. § 1962(d).

38.　According to the criminal complaint, the conspirators constituted an "Enterprise" as that term is defined in 18 U.S.C. § 1961(4), that is, a group of individuals and entities associated in fact. Householder's Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, and the enterprise engaged in, and its activities affected, interstate commerce. According to the United States, there is probable cause to believe that Conspirators conspired to conduct and participate in the conduct of the affairs of Householder's Enterprise through a pattern of racketeering activity from March 2017 to March 2020.

39.　Householder's Enterprise received over $60 million from First Energy entities, paid through Generation Now and controlled by Householder and the Enterprise. In exchange for payments from FirstEnergy, Householder's Enterprise helped pass HB 6, legislation described by an Enterprise member as a billion-dollar "bailout" that saved FirstEnergy's two failing nuclear power plants in Ohio from closure. The Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative. To achieve these ends, and to conceal the scheme,

Householder's Enterprise passed money received from FirstEnergy affiliates through multiple entities that it controlled. Householder's Enterprise then used the bribe payments to further the goals of the Enterprise, which include: (1) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments; (2) enriching and benefitting the enterprise, its members, and associates; and (3) promoting, concealing, and protecting purposes (1) and (2) from public exposure and possible criminal prosecution.

40.    On August 10, 2020, FirstEnergy filed a Form 12b-25 Notification of Late Filing, stating that that it was unable to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 because it had "received subpoenas for records from the U.S. Attorney's Office for the Southern District of Ohio" relating to the federal criminal allegations against the now former Ohio House Speaker Householder and other individuals and entities allegedly affiliated with Householder which were unsealed on July 21, 2020.[3]

41.    On August 17, 2020, FirstEnergy filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 with the SEC. That report revealed that on July 24, 2020, Ohio's Attorney General notified FirstEnergy that it was considering legal action and instructed it not to destroy documents in its custody or control regarding HB 6.[4]

42.    Since the initial filing of this Complaint, the SEC initiated an investigation into FirstEnergy's actions with reference to the $60 million bribery scandal involving HB 6. The SEC investigation was commenced after the SEC received whistleblower information from a consultant hired to assist with an audit "of certain FirstEnergy processes and procedures for Sarbanes-Oxley

---

[3] https://www.sec.gov/Archives/edgar/data/1031296/000119312520214946/d949195dnt10q.htm
[4] FirstEnergy Corp.'s Quarterly Report Pursuant to Section 13 or 15(D) of the Securities Exchange Act of 1934 for the period ended June 30, 2020, filed August 17, 2020, at 32, found at https://investors.firstenergycorp.com/Cache/IRCache/0f95592-9bcd-de72-380b-b40afa8708f0.pdf.

compliance."[5]

43.     Further, the Public Utilities Commission of Ohio ordered FirstEnergy Corp. to "show cause" by Sept. 30, 2020, that "the costs of any political or charitable spending in support" of the bailout bill "were not included, directly or indirectly, in any rates or charges paid by ratepayers in this state."[6]

44.     On September 23, 2020, the Ohio Attorney General filed a civil racketeering lawsuit against, among others, FirstEnergy, First Energy Service Corp., FirstEnergy Solutions Corp., Energy Harbor Corp., successor in interest to FirstEnergy Solutions, Householder, and other co-conspirators, *Ohio v. FirstEnergy Corp.*, Case No. 20CV 6281 (Franklin County, Ohio Court of Common Pleas), seeking to block FirstEnergy's two nuclear power plants from receiving the more than $1 billion ratepayer bailout enacted as part of HB 6. The lawsuit also seeks compensatory, punitive, and treble damages. At the time the lawsuit was filed, Ohio Attorney General Dave Yost stated that "Ohio laws should not be built on the basis of fraud, deceit and intimidation." Attorney General Yost further stated that "[g]iven the corruption surrounding House Bill 6, it is proper to block these ill-gotten gains from filling the coffers of those under criminal indictment."[7]

45.     The events leading up to the revelation of the fraudulent scheme are as follows. In 2016, FirstEnergy's nuclear generation future looked grim. In its November 2016 Annual Report to Shareholders, FirstEnergy and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy

---

[5]  https://www.cleveland.com/business/2020/09/us-securities-and-exchange-commission-launches-investigation-into-firstenergy-corp.html
[6]  https://www.news5cleveland.com/news/local-news/cleveland-metro/agency-to-review-spending-by-utility-tied-to-bribery-probe
[7]  https://www.ohioattorneygeneral.gov/Media/News-Releases/September-2020-(1)/Ohio-Attorney-General-Dave-Yost-Files-Lawsuit-to-B

affiliate, Company A-1. Given this backdrop, FirstEnergy announced future options for its generation portfolio as follows: "legislative and regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. Bankruptcy laws for its affiliates involved in nuclear generation.

46.     Consistent with this forecast, FirstEnergy actively sought a "legislative solution" for its two, affiliated nuclear power plants in Ohio. For example, during FirstEnergy's fourth-quarter 2016 earnings conference call, FirstEnergy President and CEO Jones stated that:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero-emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.
>
> We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [FirstEnergy] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far, and we will keep you posted as this process unfolds.

47.     However, attempts to obtain a legislative solution had failed to pass, including the ZEN (Zero-Emissions Nuclear Resource Program), energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017.

48.     While FirstEnergy was in search of a solution to its nuclear energy problem, Householder was re-entering politics, winning back his State House seat in Perry County, Ohio, with the goal of winning back the Speakership in January 2019. Following his January 2017 trip on FirstEnergy's private jet, in March 2017, Householder began receiving quarterly $250,000 payments from FirstEnergy, primarily through its subsidiary FirstEnergy Service Co., into a bank account in the name of a 501(c)(4) entity secretly controlled by Householder called Generation

Now.

49. In 2017 and 2018, Householder's Enterprise received into Generation Now, and the entities it controlled, over $2.9 million from FirstEnergy. Members of Householder's Enterprise used FirstEnergy's payments for their own personal benefit and to gain support for Householder's political bid to become Speaker. In the Spring and Fall of 2018, the Enterprise spent millions in FirstEnergy money to support House candidates involved in primary and general elections whom the Enterprise believed both would vote for Householder as Speaker and, ultimately, would follow his lead as Speaker and vote for bailout legislation for FirstEnergy. The FBI Affidavit states that one-fifth of these payments, in the final month before the 2018 general election, were made through checks that were signed by the Senior Vice President and CFO for FirstEnergy Service Corporation, Defendant Strah, who is now President of FirstEnergy. *See FBI Affidavit, 20-MJ-00526*, at ¶¶42, 82, 83, fn. 22.

50. The plan worked. Householder-backed candidates that benefitted from FirstEnergy money received by Generation Now helped elect Householder as the Ohio Speaker of the House in January 2019. Householder fulfilled his end of the corrupt bargain shortly thereafter. Three months into his term as Speaker, HB 6 was introduced to save FirstEnergy's two failing nuclear power plants from closure. Specifically, HB 6 subsidized nuclear energy operations in Ohio through a monthly charge on all Ohioan's energy bills. Neil Clark described the legislation as a "bailout" for FirstEnergy's nuclear assets, worth $1.3 billion to FirstEnergy.

51. FirstEnergy executives worked closely with Householder and Generation Now employees to ensure that passage of HB 6's bailout plan proceeded smoothly. For example, records show that from February 2017 to July 2019, Householder had 84 phone contacts FirstEnergy's CEO, Defendant Jones. Householder had 30 phone contacts with him from January 2019 to July

2019, the period from when Householder became Speaker until HB 6 was introduced and signed into law. *See FBI Affidavit, 20-MJ-00526*, at ¶182. "This includes a phone call on January 7,2019, the day Householder was elected Speaker; and multiple lengthy phone calls in the weeks leading up to introduction of HB 6 and shortly after passage of the bill." *Id.* Householder had l4 phone contacts with Defendant Dowling, FirstEnergy's VP of External Affairs and 188 contacts with FirstEnergy's Ohio Director of State Affairs. *Id.*

52.     After the introduction of the bailout legislation, FirstEnergy began increasing its payments into Generation Now for the benefit of the Enterprise. On April 30, 2019, roughly two weeks after introduction of the legislation, FirstEnergy wired $1.5 million to Generation Now. In the month of May 2019, while the controversial legislation was pending before lawmakers, FirstEnergy wired four additional payments totaling $8 million. The Enterprise used some of that money for mailers and media advertisements to pressure members to support the legislation. The Enterprise also used FirstEnergy money for their personal benefit, as described below. In the same month that the Enterprise received $8 million from FirstEnergy, Householder and other Enterprise members pressured House members to vote for HB 6, and instructed at least one representative to destroy text messages from Householder after Householder attempted to gain support for HB 6 from the representative.

53.     On May 29, 2019, HB 6 passed the House, and after Enterprise members exerted pressure on the Senate, the legislation was passed and was signed into law by the Governor. That process took about two months. However, the law would not go into effect until October 22, 2019. Shortly after the Governor signed the legislation, a campaign began to organize a state-wide ballot initiative referendum ("Ballot Campaign") to overturn the legislation. This required Ballot Campaign organizers to collect the signatures of registered voters in order to put the referendum

of HB 6 on the 2020 ballot. And so, FirstEnergy's and the Enterprise's fight continued.

54. In response, from July 24 to October 22, 2019, FirstEnergy-controlled accounts wired over $38 million into Generation Now to defeat the Ballot Campaign so HB 6 would go into effect. The Enterprise funneled the money to various accounts and entities controlled by the Enterprise to purchase media ads and mailers against the ballot initiative, to conflict out signature collection firms, and to pay off and bribe signature collectors supporting the referendum. The members and associates of the Enterprise also used the FirstEnergy money to enrich themselves and further their personal interests.

55. FirstEnergy entities paid Householder's Enterprise $60,886,835.86 in secret payments over the approximately three-year period in exchange for the billion-dollar-bailout. The Enterprise concealed the payments by using a 501(c)(4) to receive the bribe money, and then transferring the payments internally to a web of related entities and accounts. The millions paid into the entity are akin to bags of cash--unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny--and the Enterprise freely spent the bribe payments to further the Enterprise's political interests and to enrich themselves. As Conspirator Neil Clark stated in a 2019 recorded conversation, FirstEnergy operated as the Enterprise's "Bank." Clark explained, "*Generation Now is the Speaker' s (c)(4),*" and FirstEnergy's "*deep pockets,*" and the money to the Enterprise through Generation Now was "*unlimited.*" Conspirator Matthew Borges similarly described FirstEnergy's payments to the Enterprise as "*Monopoly money.*"

56. The Enterprise used some of the FirstEnergy money to help enact the bailout legislation. Additionally, the Enterprise used millions of dollars of FirstEnergy bribe money to further Householder's political ambitions by funding his own campaign, and the campaigns of

members and candidates who would eventually support Householder's election for Speaker. The FirstEnergy payments funded the operating costs of the Enterprise and paid for Householder's political and campaign staff. Conspirators also paid themselves personally millions of dollars.

57.     The Householder Enterprise benefitted from FirstEnergy's money by spending FirstEnergy to Generation Now funds to back Householder-selected candidates who would help elect Householder as Speaker. The Enterprise also used the money to pay for part of Householder's own campaign.

58.     The Ohio Attorney General's September 23, 2020 civil racketeering lawsuit was the first regulatory action to specifically charge FirstEnergy entities -- FirstEnergy, First Energy Service Corp., FirstEnergy Solutions Corp., and Energy Harbor Corp. (the "FirstEnergy Entities") – with wrongdoing. It referred to the FirstEnergy Entities collectively with Householder and the other defendants as both an "Enterprise" and an "Unholy Alliance."

> The Unholy Alliance and Enterprise are an interchangeable way to describe the corruption of FirstEnergy Corp. and its subsidiaries and affiliates… and individuals like Larry Householder and others, a pattern of corruption that continues to threaten the State of Ohio to this day.

59.     The Ohio Attorney General's complaint alleged that from about January 1, 2017 and continuing through the filing of the complaint, FirstEnergy and the other defendants engaged in multiple acts of Corrupt Activity as defined in R.C. 2923.31, which consist of Money Laundering violations of R.C. 1315.55, multiple instances of Extortion, violations of R.C. 2905.11, multiple instances of Bribery, violations of R.C. 2921.02 and Tampering with Evidence, violations of R.C. 2921.12.

60.     The Ohio Attorney General's complaint described the scheme in detail explaining how the Unholy Alliance routed millions of dollars through the FirstEnergy Entities, in partnership

with Householder, and built and engaged a team of lobbyists, political strategists, 501 (c)(4) entities, attorneys, consulting firms and media companies to create a machine that would allow the combined FirstEnergy Entities to covertly put over $60 million into introducing, passing HB 6 and protecting it from referendum.

61.    The Ohio Attorney General noted that "[t]he corrupt acts at issue in this case are rooted in financial distress, political ambition and greed," and concluded ***"[t]he acts as set forth above are only the beginning. The full breadth of the Unholy Alliance has yet to be revealed.*** What has come to light thus far reveals a long running scheme that co-opted Ohio's legislative and referendum processes through coercion, intimidation, bribery and collusion." (Emphasis added).

62.    Not only did Defendants fail to prevent the long running scheme, some of them actively participated in it right under the Director Defendants' watch.

63.    In addition to the foregoing, during the period between 2017 and 2020, several of the Defendants engaged in insider trades which rendered them unable to exercise the independent judgment required of them to investigate the allegations relating to FirstEnergy's participation in the illegal scheme involving passage of Ohio's HB6.

64.    According to Forms 3 and 4 filed with the SEC, Defendants Jones, Strah, Reffner, Dowling, and Yeboah-Amankwah sold or otherwise disposed of millions of dollars' worth of FirstEnergy stock during that time, all while in the possession of material, non-public information.

65.    When they sold their stock, Defendants Jones, Strah, Reffner, Dowling, and Yeboah-Amankwah knew, participated, or recklessly disregarded the unlawful practices related to the over $ 60 million in secret payments paid Householder's Enterprise in exchange for the billion-dollar plus bailout provided by Ohio's HB 6.

66.    These Defendants engaged in these transactions despite the fact that they were in

possession of this materially adverse information and that the Company's own Insider Trading Policy specifically prohibited persons who were aware of material non-public information about the Company from trading in securities of the Company.

67.     During the period between 2017 and 2020, before the full extent of the bribery scheme relating to the Householder Enterprise and the passage of HB 6 became publicly known, and prior to its subsequent impact on FirstEnergy, and while directly participating in the bribery scheme, Defendant Jones sold or otherwise disposed of over 788,000 shares of FirstEnergy common stock for a total of over $31 million. Defendant Jones engaged in the following transactions, as indicated on the chart below, with the non-public knowledge of FirstEnergy's conduct with respect to the bribery scheme alleged herein became public, and knowing that FirstEnergy would be revealed to be so culpable that its share price would drop.

| Trade Date | Form | Insider | Code | Direct | Share Price | Shares Changed | Value |
|---|---|---|---|---|---|---|---|
| 3/1/2017 | 4 | Jones Charles E | F - Taxes | D | $31.74 | 24,485 | $777,153.90 |
| 3/1/2018 | 4 | Jones Charles E | F - Taxes | D | $32.48 | 106,716 | $3,466,402.47 |
| 3/1/2018 | 4 | Jones Charles E | D - Sale to Issuer | D | $32.48 | 116,045 | $3,769,431.71 |
| 3/1/2019 | 4 | Jones Charles E | F - Taxes | D | $40.73 | 134,511 | $5,478,633.03 |
| 3/1/2019 | 4 | Jones Charles E | D - Sale to Issuer | D | $40.73 | 148,302 | $6,040,340.46 |
| 3/1/2020 | 4 | Jones Charles E | F - Taxes | D | $44.40 | 123,757 | $5,494,810.80 |
| 3/1/2020 | 4 | Jones Charles E | D - Sale to Issuer | D | $44.40 | 134,576 | $5,975,174.40 |
| | | | | | | 788,392 | $31,001,946.77 |

68.     During the period between 2017 and 2020, before the full extent of the bribery scheme relating to the Householder Enterprise and the passage of HB 6 became publicly known, and prior to its subsequent impact on FirstEnergy, and while directly participating in the bribery scheme, Defendant Strah sold or otherwise disposed of over 150,000 shares of FirstEnergy common stock for a total of nearly $4 million. During this period, Defendant Strah was Senior

Vice President in charge of utility operations and later FirstEnergy's CFO, with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, and thus, possessed non-public knowledge of FirstEnergy's conduct with respect to the bribery scheme. Despite this knowledge, Defendant Strah engaged in the following transactions, as indicated on the chart below, and knowing that FirstEnergy would be revealed to be so culpable that its share price would drop.

| Trade Date | Form | Insider | Code | Direct | Share Price | Shares Changed | Value |
|---|---|---|---|---|---|---|---|
| 3/1/2020 | 4 | Strah Steven | F - Taxes | D | $44.40 | 2,330 | $103,452.00 |
| 3/1/2020 | 4 | Strah Steven | D - Sale to Issuer | D | $44.40 | 24,020 | $1,066,488.00 |
| 3/1/2019 | 4 | Strah Steven | F - Taxes | D | $40.73 | 21,608 | $880,093.84 |
| 3/1/2019 | 4 | Strah Steven | D - Sale to Issuer | D | $40.73 | 23,823 | $970,310.79 |
| 3/1/2018 | 4 | Strah Steven | F - Taxes | D | $32.48 | 12,716 | $413,047.47 |
| 3/1/2018 | 4 | Strah Steven | D - Sale to Issuer | D | $32.48 | 12,347 | $401,061.43 |
| 3/1/2017 | 4 | Strah Steven | F - Taxes | D | $31.74 | 2,454 | $77,889.96 |
| | | | | | | 150,830 | $3,912,343.49 |

69.     During the period between 2017 and 2020, before the full extent of the bribery scheme relating to the Householder Enterprise and the passage of HB 6 became publicly known, and prior to its subsequent impact on FirstEnergy, and while directly participating in the bribery scheme, Defendant Reffner sold or otherwise disposed of over 51,000 shares of FirstEnergy common stock for a total gain of over $2 million. During this period, he was Senior Vice President and Chief Legal Officer, and a member of FirstEnergy's Leadership Council, with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, and thus, would have possessed non-public knowledge of FirstEnergy's conduct with respect to the bribery scheme.  Despite this knowledge, Defendant Reffner engaged in the following transactions, as indicated on the chart below, and knowing that FirstEnergy would be

revealed to be so culpable that its share price would drop.

| Trade Date | Form | Insider | Code | Direct | Share Price | Shares Changed | Value |
|---|---|---|---|---|---|---|---|
| 3/1/2017 | 4 | Robert Reffner | F - Taxes | D | $31.74 | 5,175 | $164,254.50 |
| 3/1/2018 | 4 | Robert Reffner | F - Taxes | D | $32.48 | 4,917 | $159,716.45 |
| 3/1/2018 | 4 | Robert Reffner | D - Sale to Issuer | D | $32.48 | 7,978 | $259,145.39 |
| 3/1/2019 | 4 | Robert Reffner | F - Taxes | D | $40.73 | 7,362 | $299,854.26 |
| 3/1/2019 | 4 | Robert Reffner | D - Sale to Issuer | D | $40.73 | 9,132 | $371,946.36 |
| 3/1/2020 | 4 | Robert Reffner | F - Taxes | D | $44.40 | 8,052 | $357,508.80 |
| 3/1/2020 | 4 | Robert Reffner | D - Sale to Issuer | D | $44.40 | 9,207 | $408,790.80 |
| | | | | | | 51,823 | $2,021,216.56 |

70.     During the period between 2017 and 2020, before the full extent of the bribery scheme relating to the Householder Enterprise and the passage of HB 6 became publicly known, and prior to its subsequent impact on FirstEnergy, and while directly participating in the bribery scheme, Defendant Dowling sold or otherwise disposed of over 38,000 shares of FirstEnergy common stock for a total gain of over $1.2 million. During this period, he was Senior Vice President, External Affairs, and a member of FirstEnergy's Leadership Council, with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, and thus, would have possessed non-public knowledge of FirstEnergy's conduct with respect to the bribery scheme. Despite this knowledge, Defendant Dowling engaged in the following transactions, as indicated on the chart below, and knowing that FirstEnergy would be revealed to be so culpable that its share price would drop.

| Trade Date | Form | Insider | Code | Direct | Share Price | Shares Changed | Value |
|---|---|---|---|---|---|---|---|
| 3/1/2017 | 4 | Michael J Dowling | F - Taxes | D | $31.74 | 5,007 | $158,922.18 |
| 3/1/2018 | 4 | Michael J Dowling | F - Taxes | D | $32.48 | 5,375 | $174,593.44 |

| | | Dowling | D - Sale to | | | | |
|---|---|---|---|---|---|---|---|
| 3/1/2018 | 4 | Michael J | Issuer | D | $32.48 | 8,729 | $283,539.74 |
| | | Dowling | | | | | |
| 3/1/2019 | 4 | Michael J | F - Taxes | D | $40.73 | 8,629 | $351,459.17 |
| | | Dowling | D - Sale to | | | | |
| 3/1/2019 | 4 | Michael J | Issuer | D | $40.73 | 10,446 | $425,465.58 |
| | | | | | | 38,186 | $1,235,057.93 |

71.     During the period between 2017 and 2020, before the full extent of the bribery scheme relating to the Householder Enterprise and the passage of HB 6 became publicly known, and prior to its subsequent impact on FirstEnergy, and while directly participating in the bribery scheme, Defendant Yeboah-Amankwah sold or otherwise disposed of over 12,000 shares of FirstEnergy common stock for a total gain of over $453,000. During this period, she was Vice President, General Counsel and Chief Ethics Officer, and a member of FirstEnergy's Leadership Council, with knowledge of FirstEnergy's strategies related to lobbying and "legislative solutions" for the Company's energy assets, and thus, would have possessed non-public knowledge of FirstEnergy's conduct with respect to the bribery scheme. Despite this knowledge, Defendant Yeboah-Amankwah engaged in the following transactions, as indicated on the chart below, and knowing that FirstEnergy would be revealed to be so culpable that its share price would drop.

| Trade Date | Form | Insider | Code | Direct | Share Price | Shares Changed | Value |
|---|---|---|---|---|---|---|---|
| | | Yeboah-Amankwah | | | | | |
| 3/1/2019 | 4 | Ebony | F - Taxes | D | $40.73 | 2,572 | $104,757.56 |
| | | Yeboah-Amankwah | D - Sale to | | | | |
| 3/1/2019 | 4 | Ebony | Issuer | D | $40.73 | 4,052 | $165,037.96 |
| | | Yeboah-Amankwah | | | | | |
| 3/1/2018 | 4 | Ebony | F - Taxes | D | $32.48 | 2,194 | $71,266.61 |
| | | Yeboah-Amankwah | D - Sale to | | | | |
| 3/1/2018 | 4 | Ebony | Issuer | D | $32.48 | 3,456 | $112,259.52 |
| | | | | | | 12,274 | $453,321.65 |

## THE FIDUCIARY DUTIES OF THE DEFENDANTS

72.     By reason of their positions as officers, directors, and/or fiduciaries of FirstEnergy and because of their ability to control the business and corporate affairs of FirstEnergy, the

Defendants each owed First Energy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FirstEnergy in a fair, just, honest, and equitable manner. The Defendants were and are required to act in furtherance of the best interests of FirstEnergy and its shareholders so as to benefit all shareholders equally.

73.    Each director and officer of the Company owes to FirstEnergy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.    The Defendants, because of their positions of control and authority as directors and/or officers of FirstEnergy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

75.    To discharge their duties, the officers and directors of FirstEnergy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.    Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and officers of FirstEnergy, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers and directors of the Company has been ratified by the Director Defendants who

collectively comprised FirstEnergy's Board at all relevant times.

77.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the New York Stock Exchange, the Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Amended Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.    To discharge their duties, the officers and directors of FirstEnergy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of FirstEnergy were required to, among other things to:

> (a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Ohio and the United States, and pursuant to FirstEnergy's own Code of Business Conduct (the "Code of Conduct");
>
> (b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> (c)    remain informed as to how FirstEnergy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of FirstEnergy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that FirstEnergy's operations would comply with all applicable laws and FirstEnergy's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

79.    Each of the Defendants further owed to FirstEnergy and the shareholders the duty of loyalty requiring that each Defendant favor FirstEnergy's interest and that of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

80.    At all times relevant hereto, the Defendants were the agents of each other and of FirstEnergy and were at all times acting within the course and scope of such agency.

81.    Because of their advisory, executive, managerial, and directorial positions with FirstEnergy, each of the Defendants had access to adverse, non-public information about the Company.

82.    The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by FirstEnergy.

83.    Defendants owe fiduciary duties to FirstEnergy and its shareholders, including duties of loyalty, good faith, and candor. In addition, FirstEnergy's foundational corporate documents detail the requirements of the Board's duties, requiring, *inter alia*, that the Board actively identify and report any illegal and/or unethical business practices within the Company.

84.    FirstEnergy's Code of Business Conduct provides, in part, as follows:

> This Code of Business Conduct (the "Code") serves as a reminder of the high standards we must meet in our day-to-day business activities. It also helps to guide us when formulating and pursuing Company goals and objectives.
>
> FirstEnergy personnel are all responsible for complying with applicable laws and regulations and the principles and provisions included in this Code.
>
> No single book or code of conduct policy can provide answers to every situation. This Code is to be used as a guide for ethical conduct and help foster a culture of honesty and accountability. It is endorsed by FirstEnergy's Board of Directors and executives, communicates our culture of intolerance for retaliation, provides policy guidance, and concludes with a question and answer section.
>
> It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity and engage in open, honest, direct, and ongoing dialogue. In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and personnel to fully comply with all applicable laws, regulations, and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct.
>
> *"Maintaining high ethical standards builds trust with customers, shareholders, FirstEnergy Personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being*

*aware of ethical issues that we may face on the job.*"

**Fair Dealing** - We have built a reputation as a trustworthy and ethical member of our community and our industry.  We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform, or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, Code of Business Conduct 6 honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees. You should direct any questions about dealing with government employees to your supervisor."

**Conflicts of Interest** - We should all be aware of any potential influences that impact or appear to impact our loyalty to FirstEnergy. A "conflict of interest" can occur when your personal interest interferes with – or may appear to interfere with – the interests of the Company as a whole, or when your personal interests make it difficult for you to perform your job duties objectively and effectively. Conflicts of interest also arise when personnel, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company. Avoid situations in which your personal interests are in conflict, or appear to be in conflict, with the interests of the Company or your job responsibilities. This includes the use of knowledge gained through your work activities to make decisions that will lead to personal gain and that are contrary to the law or the interests of the Company.  This also includes financial relationships, including equity interests and loans to, or guarantees of obligations of, the party with the FirstEnergy relationship. Furthermore, the Company will not make any loans or guarantees to executive officers or their family members. You also have the specific responsibility of understanding and abiding by the Company's expanded Conflicts of Interest Policy.

85.     FirstEnergy's Conflict-Of-Interest Policy also states, among other things, that:

All personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer, have an obligation to conduct Company-related business in an environment free from the influence of conflicting personal interests. Generally, a conflict of interest arises when our position or job responsibilities present an opportunity for personal gain or when an obligation or situation resulting from our personal activities and financial affairs may influence our judgment and action in the performance of our Company duties.

86.     Despite the fact that Defendants owed their fiduciary duty to FirstEnergy and its shareholders, the Director Defendants utterly failed in their duty of oversight for years preceding the filing of the criminal complaint of conspiracy against Householder and his Enterprise, and the Ohio Attorney General's civil racketeering lawsuit against the FirstEnergy Entities. The Director Defendants were on notice of oversight issues related to the political expenditures and lobbying, and even claimed to have a process in place for reviewing such expenditures. Nevertheless, the Board disregarded numerous red flags, media scrutiny, and concern from shareholders and expert analysts. In light of the fact that the Company's pursuit of "legislative solutions" was essential to its future success, the Company's internal controls and procedures related to lobbying and political contributions were mission-critical.

87.     Additionally, the FirstEnergy Board maintained several oversight committees which should have been in a position to prevent the Company from participating in the bribery scheme and, consequently, sustaining the massive losses that have occurred as a result. These committees include the Audit Committee and the Corporate Governance and Corporate Responsibility Committee.

88.     Director Defendants Anderson, Misheff, Pianalto, and Turner presently comprise the Audit Committee. The Audit Committee's Charter provides that its purpose is to "assist the Board with oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal, risk management and regulatory requirements. . . . and (v) the Company's systems of internal controls with respect to the accuracy of financial records, adherence to Company policies and compliance with legal and regulatory requirements." The Committee is obliged to "review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor," "oversee, require and review periodic

28

evaluations of the Company's internal control and corporate compliance structures," and to "oversee, assess, discuss, and review the Company's policies with respect to the Company's . . . assessment and management of risks . . . ." The Audit Committee's Charter also states:

> Periodically, the Committee shall meet with appropriate members of management to review adherence to applicable federal, state, and local laws and corporate policies and review processes relating to training, monitoring and reporting of policy compliance. In particular, the Committee shall review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and regulations, and shall review the record keeping and reporting systems to measure and monitor regulatory compliance requirements.

89. Director Defendants Anderson, Misheff, Pianalto, and Turner, as members of the Audit Committee, failed to meet their responsibilities and obligations as set forth above. This illegal course of conduct constituted breaches of their fiduciary duties to FirstEnergy, as well as violations of state and federal law, and resulted in significant harm to the Company.

90. Director Defendants Johnson, Misheff, Mitchell, and Reyes sit on the Corporate Governance and Corporate Responsibility Committee. The Corporate Governance and Corporate Responsibility Committee is required to "periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate participation, and dues and/or contributions to industry groups and trade associations." However, given the course of conduct as alleged here, the Corporate Governance and Corporate Responsibility Committee either abdicated its responsibility, or condoned FirstEnergy's course of conduct. In either instance, Director Defendants Johnson, Misheff, Mitchell, and Reyes breached their fiduciary duties.

91. The Director Defendants' failure to stop the Company from funding and participating in a widespread, years-long criminal bribery scheme that subjected FirstEnergy to massive legal, business, and reputational harm and liabilities demonstrates that the Company's purported oversight mechanisms related to political expenditures and lobbying were wholly

illusory.

## **DERIVATIVE ALLEGATIONS**

92.     Plaintiff brings this action derivatively to redress injuries suffered by FirstEnergy as a result of the breaches of fiduciary duties by Defendants.

93.     Plaintiff owned FirstEnergy stock during the time of the wrongful course of conduct constituting the basis for the claims asserted herein and continues to hold such stock.

94.     Plaintiff's stock value was significantly reduced and negatively impacted as a result of the action and/or inactions as alleged herein.

95.     Plaintiff's claims and economic position is not antagonistic to the other shareholders, whose stock value(s) were also significantly and negatively impacted by Defendants' actions and/or inactions as alleged herein.

96.     Plaintiff will adequately and fairly represent the interests of FirstEnergy and its shareholders in prosecuting and enforcing its rights and has retained counsel competent and experienced to prosecute this action.

## **DEMAND ON THE FIRST ENERGY BOARD IS EXCUSED AS FUTILE**

97.     A pre-suit demand on the Board of FirstEnergy is futile and, therefore, excused.

98.     At the time of the filing of this action, the FirstEnergy Board was comprised of eleven directors. Plaintiff needs only to allege demand futility as to six of these eleven directors.

99.     Demand is excused because, in order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal or SEC sanctions. This they will not do. Specifically, in addition to FirstEnergy, Defendant Jones has been named as a defendant in several putative class actions asserting violations of §§10(b) and 20(a) of

the Exchange Act and SEC Rule 10b-5 in connection with FirstEnergy's issuance of materially false and misleading statements and financial reports. Jones' participation, along with that of Defendant Strah in the alleged fraud is detailed in the Complaint for Violations of the Federal Securities Laws filed in that matter on July 28, 2020, and because all of the other board members are beholden to Defendant Jones, they cannot effectively investigate and prosecute the claims detailed herein.

100.    Demand is excused as to all of the Director Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of their violations of law alleged herein.

101.    Demand is likewise excused because a majority – seven members – of the current Board served on the Company's Board as of March 2017 – at or about the same time FirstEnergy was seeking a "legislative solution" to its financial troubles with its nuclear power plants. Those seven members, Defendants Anderson, Johnson, Jones, Misheff, Mitchell, Pappas, and Reyes recommended that shareholders vote *against a shareholder proposal requesting transparency and accountability on lobbying policies and payments* that would have required disclosure of the wrongdoing at issue. Similar shareholder proposals were defeated in 2015 and 2016, with Defendants Anderson, Johnson, Jones, Misheff, Pappas, and Reyes recommending shareholders vote *against* the proposals in each of those years.

102.    More specifically, on March 31, 2017, the Company filed its Schedule 14A with the SEC (the "2017 Proxy Statement"). Included in the 2017 Proxy Statement was a shareholder proposal requiring an annual report on lobbying policies and payments. According to the 2017 Proxy Statement, FirstEnergy shareholder, The Nathan Cummings Foundation, planned to introduce the proposal at the Company's Annual Meeting as follows:

**Whereas:** we believe full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders.

**Resolved,** the shareholders of FirstEnergy request the preparation of a report, updated annually, disclosing:

1.    Company policies and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.

2.    Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.

3.    FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.

4.    A description of the decision-making process and oversight by management and the Board for making payments described in section 2 and 3 above.

For purposes of this proposal, a "grassroots lobbying communication" is a communication is a communication directed to the general public that (a) refers to specific legislation or regulation, (b) reflects a view on the legislation or regulation and (c) encourages the recipient of the communication to take action with respect to the legislation or regulation. "Indirect lobbying" is lobbying engaged in by a trade association or other organization of which FirstEnergy is a member.

Both "direct and indirect lobbying" and "grassroots lobbying communications" includes efforts at the local, state and federal levels.

The report shall be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

As shareholders, we encourage transparency and accountability in FirstEnergy's use of corporate funds to influence legislation and regulation, both directly and indirectly. FirstEnergy spent approximately $4.05 million in 2014 and 2015 on direct federal lobbying activities (opensecrets.org). These figures do not include lobbying expenditures to influence legislation in states, where FirstEnergy also lobbies but disclosure is uneven or absent. For example, FirstEnergy spent $1.07 million on lobbying in New Jersey for 2014 and 2015, and FirstEnergy's lobbying on energy rates in West Virginia has drawn media attention ("FirstEnergy Asking for Surcharge to Fund Improvements," *Charleston Gazette-Mail,* August 25, 2016).

FirstEnergy is listed as a member of the of the Edison Electric Institute and Nuclear Energy Institute, which together spent $21.32 million lobbying in 2014 and 2015. However, FirstEnergy does not disclose its membership in, or payments to, trade associations, or the amounts used for lobbying, despite a 2007 agreement with shareholders to annually disclose trade association payments used for political purposes ("More Firms to Make Political Disclosures," *CFO,* April 4, 2007). Nor does FirstEnergy disclose membership in or contributions to tax exempt organizations that write and endorse model legislation, such as the American Legislative Exchange Council.

We are concerned that FirstEnergy's current lack of trade association disclosure presents reputational risk. Absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests.

103.    FirstEnergy's 2017 Board responded to the shareholder proposal as follows:

Your company believes that it has a responsibility to participate in the legislative, regulatory and political process. Sharing its views and educating officeholders, regulators, community and business leaders, and the public on key issues helps your Company promote effective government and the interests of key stakeholder groups including our shareholders, employees and communities we serve. By engaging with elected officials, regulators, community and business leaders, and other decision makers, your Company strives to conduct its business as transparently as possible to serve customers effectively and help build public trust.

In addition to the existing extensive framework of laws and public disclosure, your Company adopted a Political Activity Policy, which was most recently updated in October 2016. The Political Activity Policy addresses your Company's participation in the political process and political contributions and lobbying expenses.

Such policy can be found at https://www.FirstEnergycorp.com/investor/corporate_governance/policies_charters/corporate_political_activity_policy.html.

The Political Activity Policy also provides links to access your Company's federal lobbing reports. Your Company complies with all federal and state lobbying registration and disclosure requirements, which include filing all required reports with the U.S. Congress and applicable state agencies.

These reports detail information such as the particular bills and

issues on which individual lobbyists had activity on behalf of your Company, as well as the lobbying expenses for specific time periods. As set forth in the Political Activity Policy, your Company maintains and files Lobbying Disclosure Act Reports (Form LD-2) with the U.S. Congress. These reports detail the particular bills and issues on which individual lobbyists had activity on behalf of your Company, as well as the total lobbying expenses, including payments made to trade organizations.  These reports may be found at:
http://www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm.

Additionally, as described in the Political Activity Policy, your Company and its registered federal lobbyists must also file semi-annual reports detailing, among other things, disbursements and personal and/or direct contributions to federal candidates' national party committees.  These forms (LD-203) may be found at: http://www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm.

State reports disclosing activity at the state and local levels, if required, are also made publicly available for review on the applicable state agency website.

Your Company is committed to providing appropriate information and disclosures to its investors concerning its lobbying activities. Additionally, your Company believes that its current procedures and policies promote transparency and compliance with the law and addresses the concerns identified in the proposal. Preparation of reports beyond what is already produced would be a duplicative and onerous task that would divert important resources from alternative efforts that your Company's Board and management deem to be in the best interests of your Company and its shareholders. Substantially similar shareholder proposals did not receive a majority of the votes cast in 2015 and 2016.

Your Board recommends that you
**Vote "AGAINST" this shareholder proposal (Item 9).**

104.     Thus, the Company's Board has demonstrated long-standing opposition to transparency regarding payments to public officials at the state level, as its recommendation to vote against shareholder proposals requiring such disclosure in 2015, 2016 and 2017 demonstrate. Moreover, in 2017, just months after the illegal scheme started, a majority of the current Board recommended shareholders vote against the proposal that would have required disclosure of the illegal payments at issue, demonstrating that demand on the current Board to take action in

response to the illegal payments would be futile.

105.     Similarly, the Company filed its 2018 Annual Proxy Statement (the "2018 Proxy") in connection with the 2018 annual stockholders meeting to be held on May 15, 2018.  In the 2018 Proxy, these Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board, and (ii) approve executive compensation. With respect to each of these solicited votes, the Director Defendants issued materially false or misleading statements.

106.     The 2018 Proxy described the Board's key role in risk oversight.  Specifically, the 2018 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks." It detailed committees such as a "Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

107.     The 2018 Proxy Statement also detailed how FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

108.     The 2018 Proxy falsely and misleadingly suggested that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting its failure to appropriately address the bribery scheme; and (iii) Board-approved compensation programs that encouraged the

risky conduct that led to the bribery scheme. The 2018 Proxy also omitted any disclosures reflecting or acknowledging that Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2018 Proxy was filed the bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to Householder's relationship with FirstEnergy.

109.     The 2018 Proxy harmed FirstEnergy by prohibiting stockholders from making informed decisions when voting for directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2018 Proxy Statement, FirstEnergy stockholders voted to re-elect Defendants Addison, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Thornton to the Board.

110.     Likewise, FirstEnergy's 2019 and 2020 Proxy Statements misled stockholders and prevented them from making informed decisions concerning FirstEnergy's corporate affairs, its Directors' conduct, and potential corporate losses.

111.     On April 1, 2019, FirstEnergy issued its 2019 Annual Proxy Statement (the "2019 Proxy") in connection with the 2019 annual stockholders meeting to be held on May 21, 2019. In the 2019 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board; and (ii) approve executive compensation. With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

112.     The 2019 Proxy described the Board's key role in risk oversight.  Specifically,

the 2019 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks." It detailed committees such as a "Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

113. The 2019 Proxy Statement also detailed how FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

114. Specifically, with respect to the Corporate Governance Committee, the 2019 Proxy stated that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." According to the 2019 Proxy, "The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

115. The 2019 Proxy falsely and misleadingly suggested that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2019 Proxy also omitted

any disclosures reflecting or acknowledging that Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2019 Proxy was filed the bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout.  Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to Householder's relationship with FirstEnergy.

116.    The 2019 Proxy harmed FirstEnergy by prohibiting stockholders from making informed decisions when voting for directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2019 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

117.    The 2019 Proxy's statements relating to compensation misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

118.    Having accordingly been misled, FirstEnergy's shareholders voted in support of compensation to Defendants Jones, Strah, and Pearson and other executives totaling over $11.1 million, $3.4 million, and $3.8 million, respectively, in 2018 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the bribery scheme.

119.    In the 2020 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board; and (ii) approve executive compensation.

With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

120. The 2020 Proxy described the Board's key role in risk oversight. Specifically, the 2019 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks." It detailed committees such as a "Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

121. The 2020 Proxy Statement also detailed how FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

122. Specifically, with respect to the Corporate Governance Committee, the 2020 Proxy stated that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." According to the 2020 Proxy, "The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

123. The 2020 Proxy falsely and misleadingly suggests that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i)

FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the bribery scheme. The 2020 Proxy also omitted any disclosures reflecting or acknowledging that Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2020 Proxy was filed the Ohio bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to Householder's relationship with FirstEnergy.

124.     The 2020 Proxy harmed FirstEnergy by prohibiting stockholders from making informed decisions when voting for directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2020 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

125.     Each of the Director Defendants participated in and/or caused the issuance of the 2017, 2018, 2019, and 2020 Proxies described above. These Proxies inaccurately assured the investing public that the Board maintained effective risk management controls. These Proxies lacked disclosures of (i) the ineffective internal and disclosure controls at the board level; (ii) the reporting failures that failed to address serious and illegal misconduct by senior executives; and (iii) the fact that the Company actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices. The Director Defendants had knowledge of undisclosed material facts alleged herein and knowingly or consciously disregarded them and acted in bad faith by releasing the false

and misleading Proxies.

126.     Demand is further excused as futile because each of the Director Defendants has received and continues to receive compensation for his or her role as Director. As trusted Directors, they conducted little, if any, oversight of the contributions at issue, and consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For those reasons, too, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and therefore, excused.

127.     In addition, the sheer size of these contributions totaling in excess of $60 million could not be done without the Director Defendants' knowledge and approval. All of the Director Defendants were required to participate in both the review and approval of First Energy's activities including, without limitation, payment of over $60,000,000.00 designed to assist Householder's Enterprise, which resulted in a legislative kickback through the passage of HB 6 of approximately $1.3 Billion dollars. Indeed, Defendant Jones has publicly stated that First Energy is innocent and "acted ethically" in connection with efforts to pass House Bill 6 that federal prosecutors say were fueled by bribery, which statement acknowledges that Defendants were aware of the decision to funnel bribes to Householder's Enterprise, and approved those actions.

128.     All Director Defendants are directors, and their self-dealing as alleged herein resulted in direct financial gains to Defendants from the challenged transactions and actions as alleged herein, making it a substantial likelihood that each of the Director Defendants named herein will be found liable for their self-dealing actions, participation, approval and/or ratification of FirstEnergy's participation in Householder's Enterprise.

129.     Director Defendants Jones, Anderson, Johnson, Misheff, Mitchell, Pianalto, Reyes

and Turner's conduct, as alleged herein demonstrates that a majority of the Director Defendants lost their independence and/or lack the ability to bring a disinterested business judgment to bear if demand had been made relative to the Householder Enterprise.

130.    Since he is employed as FirstEnergy's CEO, for which he receives substantial monetary compensation and other benefits, Defendant Jones cannot be considered an independent director under NYSE listing standards. Moreover, in addition to FirstEnergy, Defendant Jones has been named as a defendant in the Securities Class Actions.

131.    Defendant Jones also lacks independence because he faces a substantial likelihood of liability for his individual misconduct. Further, Jones has already publicly defended the Company and its actions in connection with the bribery scheme (prior to the Ohio Attorney General's lawsuit), and stated that the Company is innocent and that it acted ethically. Thus, a demand on Jones would be futile.

132.    Additionally, many of FirstEnergy's Directors serve together on other boards, which compromises their judgment and ability to be independent from each other. For example, Directors Misheff and Pappas serve together on the Trinseo S.A. Board of Directors, Misheff since February 2015 and Pappas since October 2010. Pappas in fact served as Trinseo's President and CEO from June 2010 through March 2019, and he is currently a Special Adviser to Trinseo's President and CEO.  Directors Misheff and Demetriou served together on the Aleris Corporation Board of Directors, Misheff from December 2013 through April 2018, and Demetriou as Chairman and CEO from 2004 through 2015. Misheff also is a director on the TimkenSteel Corporation Board. Leila Vespoli, FirstEnergy's Executive Vice President of Corporate Strategy, Regulatory Affairs and Chief Legal Officer, also serves on TimkenSteel's board. TimkenSteel, an Ohio-headquartered steel manufacturer, publicly advocated for the passage of HB 6. A TimkenSteel

senior executive, Joe Price, testified before the Ohio House Energy and Natural Resources Committee on May 15, 2019, in support of HB 6 for "most significantly," eliminating a mandate that required the purchase of renewable energy, which he said created costs to the company that were "significant" and "rising." TimkenSteel also supported Householder, donating $5,000 to his Friends of Householder PAC in February 2020.

133.    For all of these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

134.    FirstEnergy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FirstEnergy any part of the damages FirstEnergy suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

135.    For all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least seven of them (a majority), cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is exercised as futile.

## CLAIMS FOR RELIEF

### COUNT I
**Against the Director Defendants for Violations of
Section 14(a) of the Exchange Act**

101.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

102.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf

of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

103.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

104.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

105.    Under the direction and watch of the Director Defendants, the Company's 2017, 2018, 2019 and 2020 Proxy Statements filed with the SEC on March 31, 2017, March 30, 2018, April 1, 2019 and April 1, 2020 (the "Proxy Statements") failed to disclose, *inter alia,* the illegal scheme described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the Proxy Statements false and misleading.

106.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions

were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, ratification of the Company's independent auditor, and whether or not to approve the shareholder proposal requiring an annual report on lobbying policies and payments.

107.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

108.    Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duty Against All Defendants

109.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

110.    Each Defendant owed to the Company the duty to exercise candor, good faith, due care, and loyalty in the management and administration of FirstEnergy's business and affairs.

111.    Each of the Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, due care, reasonable inquiry, oversight and supervision.

112.    By virtue of their positions as directors and/or officers of FirstEnergy and their exercise of control over the business and corporate affairs of the Company, the Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein. Each Defendant was required to: (a) use his or her ability to control and manage FirstEnergy in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of FirstEnergy and its shareholders and not his or her own. Defendants also have the duty to oversee its CEO and ensure that he is not breaching his fiduciary duties to the Company.

113.     Additionally, Defendants have a duty to implement a reasonable system of controls to ensure that FirstEnergy is operated in conformity with applicable laws. Once that system is in place, the Directors have a duty to respond in good faith to reports or indications that FirstEnergy or its employees are engaging in unlawful or other improper behavior. Defendants have acted in violation of FirstEnergy's internal policies, including, *inter alia*, its policies regarding corporate governance, anti-corruption, and ethics.

114.     The Company's corporate governance guidelines also require Defendants to review compliance with applicable laws and regulations and adopt policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls.

115.     Defendants breached their fiduciary duties through self-dealing and/or by acting to subvert and/or failing to take any action to investigate and/or stop the improper and illegal conduct at FirstEnergy involving bribery.

116.     Based on the foregoing conduct, Defendants were not acting in good faith toward the Company, but instead were acting recklessly and/or with intent to harm the Company and breached their fiduciary duties.

117.     As a direct and proximate result of Defendants' conscious failure to perform their fiduciary obligations, FirstEnergy has been and will continue to be damaged.

118.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

119.     Plaintiff, on behalf of First Energy, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all defendants as follows:

A.     Declaring that Defendants have breached their fiduciary duties to

FirstEnergy;

B.     Declaring that Plaintiff may maintain this action on behalf of FirstEnergy and that Plaintiff is an adequate representative of the Company;

C.     Appointing Plaintiff's counsel as Lead Counsel for this derivative action;

D.     Determining that this action is a proper derivative action maintainable under law;

E.     Determining that Rule 23.1's pre-suit demand requirement for standing is excused as futile under the circumstances;

F.     Determining and awarding to FirstEnergy the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

G.     Directing FirstEnergy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

H.     Awarding FirstEnergy damages including, without limitation, punitive damages, together with pre-and post-judgment interest to the Company in excess of $25,000 as to all Counts;

I.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.       Granting such other and further relief as this Court deems just and

equitable.

Plaintiff hereby demand a trial by jury.

Dated: October 16, 2020                    /s/ Alan L. Rosca
                                           Alan L. Rosca (OBN 0084100)
                                           Goldman Scarlato & Penny, PC
                                           23250 Chagrin Blvd., Suite 100
                                           Beachwood, OH 44122
                                           T 484-342-0700
                                           rosca@lawgsp.com

                                           Marc H. Edelson, Esq. (pro hac vice pending)
                                           Eric Lechtzin, Esq. (pro hac vice forthcoming)
                                           Edelson Lechtzin LLP
                                           3 Terry Drive, Suite 205
                                           Newtown, PA 18940
                                           T 215-867-2399
                                           F 267 685-0676
                                           medelson@edelson-law.com
                                           elechtzin@edelson-law.com

                                           Paul J. Scarlato (pro hac vice forthcoming)
                                           Goldman Scarlato & Penny, PC
                                           161 Washington Street, Suite 1025
                                           Conshohocken, PA 19428
                                           T 484-342-0700
                                           scarlato@lawgsp.com

                                           https//investorlawyers.org