UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Jennifer L. Miller, | ) | CASE NO. 5:20CV1743 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| -vs- | ) | |
| | ) | |
| Michael J. Anderson, et al., | ) | ORDER |
| | ) | |
| | ) | |
| Defendants. | ) | |

At the first in-person hearing in this matter, the Court noted:

> There's a presumption of openness, transparency. That's what is [] going to occur. We're going to be transparent.
>
> …
>
> So I hope everybody understands we start with the presumption of openness, transparency, including at the discovery phase. We're not going to keep things off the docket or out of the record if it isn't required.

Doc. 166 at 20. The Court stressed that this need for transparency was all the more important based upon the nature of the complaint.

I.   **The Allegations**

The complaint alleges a bribery scheme executed by senior executives at FirstEnergy that resulted in the unlawful payment of millions and millions of dollars to elected state officials, including then Speaker of the House Larry Householder.[1] The complaint includes a quote from the chief prosecutor in the Southern District of Ohio who noted: "This is likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of

---

[1] The Court notes that Mr. Householder has been indicted, but he has not been convicted of any crime to date. Accordingly, these accusations remain allegations against him and are not proven facts.

1

Ohio…bribery, pure and simple. This was a quid pro quo." Doc. 75 at 8. The complaint alleges that the people of Ohio were directly impacted in several ways. First and foremost, the bribery scheme was designed to influence the passage of House Bill 6, a bill described in the complaint as providing "a billion-dollar-bailout for FirstEnergy's uncompetitive power plants funded by monthly ratepayer surcharges." Doc. 75 at 10. When a statewide ballot referendum threatened to repeal House Bill 6, FirstEnergy funneled more than $38 million dollars to its alleged co-conspirators to assist in defeating the citizen initiative.

As alleged, the bribery scheme was designed to *directly* take money out of the pockets of millions of Ohioans. Moreover, when the scheme came to light, Householder was criminally indicted for his role. As a result, the public's confidence in the political process was undermined. The public heard allegations that their politicians were for sale to the highest bidder and that House Bill 6 was only passed through the unlawful transfer of millions and millions of dollars from FirstEnergy.

The complaint then goes on to detail what FirstEnergy executives received in exchange for their alleged wrongdoing. During the course of the scheme, the compensation Defendants allegedly received was as follows:

        Defendant Charles Jones - **$55,207,422**

        Defendant Michael Anderson - **$1,031,757**

        Defendant Steven Demetriou - **$704,538**

        Defendant Julia Johnson - **$953,825**

        Defendant Donald Misheff - **$1,224,230**

        Defendant Thomas Mitchell - **$978,193**

        Defendant James O'Neil - **$739,825**

      Defendant Christopher Pappas - **$1,009,482**

      Defendant Sandra Pianalto - **$452,838**

      Defendant Luis Reyes - **$948,601**

      Defendant Leslie Turner - **$314,836**

      Defendant James Pearson - **$22,803,462**

      Defendant Robert Reffner - **$2,467,891**

      Defendant Steven Strah - **$16,848,974**.

In total, these Defendants are alleged to have received over **$105 million** during the course of the alleged bribery scheme.

## II. Admissions

While the complaint contains only allegations, the Court takes note of the fact that FirstEnergy made numerous admissions in its deferred prosecution agreement ("DPA") with the United States Attorney Office in the Southern District of Ohio. On July 20, 2021, FirstEnergy formally signed its DPA. In the DPA, FirstEnergy "stipulate[d] and agree[d] that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt." FirstEnergy then admitted that it "conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit." Among numerous other facts, FirstEnergy admitted to paying more than $59 million to Generation Now and more than $22 million to companies owned by "Public Official B," the then Chairman of the Public Utilities Commission of Ohio. FirstEnergy admitted that paying these millions of dollars was intended to influence official action, namely the passage of House Bill 6.

The DPA contains nearly 30 pages of facts that FirstEnergy agreed would be proven beyond a reasonable doubt if the prosecution moved forward against it. These facts detail the financial transactions and electronic communications of both unnamed FirstEnergy executives and unnamed public officials. While FirstEnergy's admissions are not conclusive upon the defendants named in this action, they provide a clear and concise road map to litigate this matter fully and fairly.

### III. Settlement on the Eve of Depositions

Based on the serious allegations raised, their impact on both the shareholders and the public at large, and FirstEnergy's prior factual admissions, the Court told the parties during their first in-person hearing that it "intend[ed] on moving this case in an expeditious way." Doc. 166 at 27. To move the case forward efficiently, the Court made space in the federal courthouse available for conducting depositions. Plaintiffs used this offer from the Court to provide a schedule that included depositions of 22 individuals, including each of the named Defendants. The first of these depositions was set to begin at 9:30 a.m. on February 10, 2022. Instead of moving forward, at 4:16 p.m. on February 10, 2022, the parties sought to stay this matter while they sought approval of their settlement in a later-filed action in the Southern District of Ohio.

As a result, those persons that received over $100 million in compensation were not required to sit in a room, swear under oath, and answer honestly about the actions they took. The settlement also reveals that none of these alleged wrongdoers will be required to contribute even $1 to the ultimate settlement. At the same time, it remains unknown how much FirstEnergy will actually receive from the settlement. While Plaintiffs continue to tout the recovery of $180

million, the settlement agreement allows Plaintiffs' counsel to seek up to approximately $48 million in attorney fees and costs.[2]

IV. **Hiding the Ball**

With the above in mind, the Court hoped to gain a better understanding of what led to settlement in this matter and what drove the amount of the settlement. The Court began its quest with a simple question to counsel to determine whether the identity of those actively approving the alleged bribes had been learned through the lawsuit. Counsel indicated that he had learned this information, but he refused to provide the Court with any names when directly asked who had paid the bribes alleged in the complaint. Specifically, counsel claimed the information was subject to the mediation privilege and made vague references to other confidentiality agreements.

When asked to brief the privilege issue that counsel claimed prevented him from answering the Court's question, none of the parties offered any reasonable argument that the Court's factual question infringes on any mediation privilege. Instead, Plaintiffs responded that "this privilege bars disclosure of information responsive to the Court's questions concerning why and how the parties' mediation process ultimately resulted in the precise terms of the Proposed Settlement[.]" Doc. 288 at 3. Contrary to such an assertion, the Court made *no inquiry* regarding the mediation process. Rather, the Court asked a direct question about whether discovery had demonstrated who paid the alleged bribes at issue in this matter. Answering that

---

[2] *Any* recovery in this matter must viewed against the backdrop of the losses suffered by FirstEnergy. The DPA required FirstEnergy to pay a fine of $230 million. To date, FirstEnergy has not recouped any of the $105 million in salary and benefits paid to the executives that are alleged to have perpetrated this scheme. FirstEnergy has incurred attorney fees in the criminal action against it, in at least three derivative lawsuits including this one, and in numerous securities fraud lawsuits. FirstEnergy also incurred costs in forming and supporting the Special Litigation Committee. It remains unclear what liability may ultimately flow from the securities fraud lawsuits, but damages could easily stretch into the millions in that suit. Finally, FirstEnergy directly lost value when its stock plummeted and its goodwill was tarnished when news of this scheme became public. As the initial complaint in this matter alleged, the total losses incurred by FirstEnergy "may well stretch into the billions of dollars." Doc. 1 at 3.

question cannot reasonably be interpreted to even tangentially touch upon the mediation process generally, let alone fall within its privilege.

Counsel then attempted to transition away from the mediation privilege and claim that the parties' protective order prohibited him from answering the Court's question. However, in so doing, Plaintiffs ignore the plain language of the protective order:

> Any and all documents that may have been subject to sealing during discovery or motion practice will not enjoy a protected or confidential designation if the matter comes on for hearing, argument, or trial in the courtroom. *The hearing, argument, or trial will be public in all respects.*

Doc. 195 at 6 (emphasis added). The protective order continues:

> Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make any orders that may be appropriate with respect to the *use and disclosure of any documents produced* or use in discovery or at trial.

Doc. 195 at 7 (emphasis added). During its March 9, 2022 hearing, the Court very clearly ordered counsel to publicly provide an answer to a question surrounding information provided during discovery. As the Court's order falls squarely within its authority in the protective order, counsel's claim that the protective order inhibits disclosure has no legal or factual basis.[3]

Finally, Plaintiffs suggest that answering the Court's question would infringe upon their work product privilege. The work product privilege protects documents "prepared in anticipation of litigation ... by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). This Court's test "asks (1) whether a document was created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable." *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006). This Court's inquiry regarding whether certain *facts* were learned

---

[3] Plaintiffs also suggest that a similar protective order entered into in the Southern District may also prohibit disclosure. However, it is clear that the parties could not agree in *either* District to restrict the release of information to the District Judge presiding over each matter. Accordingly, the protective order in the Southern District imposes no restrictions on an order from this Court.

during discovery does not touch upon counsel's work product. Accordingly, the work product privilege does not support counsel's refusal to answer the Court's question.

V. **Public Interest**

The bribery scheme giving rise to this case involved a *publicly* elected official receiving bribes from a *publicly* held company resulting in the passage of legislation that impacted the citizens of Ohio. The parties were informed early on that confidentiality agreements and protective orders would not be used to shield information from the public.

In response to the Court's most recent order, FirstEnergy through its Special Litigation Committee ("SLC") strenuously argues that public disclosure of facts will cause it more harm.[4] The SLC contends that the criminal investigation will resolve any lingering doubt about the facts surrounding the bribery scheme. The Court fundamentally disagrees with this assertion. To genuinely begin to rebuild FirstEnergy's image with the public, and therefore begin to restore the value the company has lost, there must be some recognition that FirstEnergy *knows* how certain events occurred. The public cannot begin to trust – or even evaluate – the corporate reforms proposed through the parties' settlement agreement if there is no indication that FirstEnergy actually knows what shortcomings existed that allowed for this scheme to occur and demonstrates that the reforms will remedy those shortcomings. Moreover, given that it is alleged that FirstEnergy executives perpetrated a scheme that impacted nearly every Ohioan, the Court cannot agree that FirstEnergy's

---

[4] This position is particularly disconcerting. FirstEnergy's prior Board of Directors twice defeated shareholder proposals in 2015 and 2016 that would have increased disclosure, transparency, and accountability for FirstEnergy's lobbying expenditures. The SLC now seeks a return to secrecy surrounding FirstEnergy's conduct.

interests are the sole interests that should be taken into account in this matter.[5]

It is not only the trust of FirstEnergy that must be rebuilt. This bribery scheme has undoubtedly shaken whatever trust that Ohioans may have had in the political process used by their elected officials.[6] The public has a right to know how it is that the political process was so easily corrupted.

## VI.    The Court's Role

Because this was filed as a derivative action by shareholders on behalf of FirstEnergy, the Court would ordinarily review any proposed settlement to ensure that it is fair, reasonable, and adequate. At the preliminary approval stage, "the court is required to determine whether 'the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies and whether it appears to fall within the range of possible approval." *In re: Regions Morgan Keegan Sec.*, No. 08-2260, 2015 WL 11145134, at *3 (W.D. Tenn. Nov. 30, 2015)(quotations and alterations omitted). To date, the parties have attempted to deprive the Court of any role in ensuring that any resolution of this case is fair, reasonable, and adequate. Rather than present their settlement for this Court to analyze, they have actively engaged in forum shopping to present their settlement to another district judge in a later-filed action. The parties have refused to provide information to the Court despite requesting a stay in which they offered to provide information: "Counsel are available to discuss the Settlement and this request with the Court at the Court's convenience should the Court have any questions." Doc. 273 at 6.

---

[5] Given the SLC's contention that all the same information will be made public through a criminal investigation, it is unclear how that very same information becoming public in this litigation could be deemed harmful to the company.
[6] The Court reiterates that these are merely allegations against elected officials. While FirstEnergy has admitted that they made payments with the intent to influence official actions, the elected officials have denied engaging in such conduct.

By attempting to deprive the Court of any review of the settlement in this matter, the parties undermine any public confidence in their outcome. All of the purported goals in the complaint – holding Defendants accountable and making FirstEnergy whole again chiefly among them – are thwarted. The public will have no confidence that a fair resolution was reached when so few details are made public, especially when the parties have gone to such great lengths to attempt to shield discovery from the public. While the parties may attempt to dilute the Court's role in this case, the Court will not shirk from its responsibility to ensure a fair and reasonable outcome.

## VII. Conclusion

It has now been more than 100 years since Supreme Court Justice Louis Brandeis penned his most famous statement in a 1913 Harper's Weekly article titled "What Publicity Can Do." Brandeis' statement rings just as true today. "Sunlight is said to be the best of disinfectants." Providing the Court and the public with the information learned through discovery will serve to *enhance* the public's trust that any potential resolution of this case is fair. As such, the Court will grant Plaintiffs' counsel one final opportunity to comply with the Court's order. By no later than 12:00 p.m. on March 23, 2022, counsel shall answer under oath, via affidavit, the Court's question by naming the individuals who paid the bribes in this matter, and thereafter counsel will answer the Court's further inquiries regarding what fact discovery has shown to date.

IT IS SO ORDERED.

Dated: March 22, 2022                          */s/ John R. Adams*
                                                         JOHN R. ADAMS
                                                         UNITED STATES DISTRICT JUDGE